**In re G & L PACKING CO.,**
**INC., Debtor.**

**Lawson BAST d/b/a Bast's Livestock Exchange, Cambridge Valley Livestock Market, Inc., D. R. Chambers & Sons, Inc., Lewis County Livestock Market, Inc., Maplehurst Livestock Market, Inc., Millers Livestock Market, Inc., Mohawk Valley Commission Sales, Inc., Hicks and Spingler Livestock, Inc. d/b/a Sennett Sales, J. Lawrence Fobare and Mary P. Fobare d/b/a Seymours Commission Sales, Welch Livestock Market, Inc., John G. Hendricks d/b/a Village Farm, Plaintiffs,**

v.

**ORANGE MEAT PACKING CO., INC., Marine Midland Bank, N. A., and Stephen D. Gerling, as Trustee in Bankruptcy of G & L Packing Co., Inc., Defendants.**

**EMPIRE LIVESTOCK MARKETING COOPERATIVE, INC., Plaintiff,**

v.

**Stephen D. GERLING, as Trustee in Bankruptcy of G & L Packing Co., Inc., Orange Meat Packing Co., Inc., and Marine Midland Bank, N. A., Defendants.**

**Bankruptcy No. 80 00208.**
**Adv. Nos. 80 0042, 80 0050.**

United States Bankruptcy Court,
N. D. New York.

May 24, 1982.

McPhillips, Fitzgerald, Meyer & McLenithan, Glens Falls, N. Y., for plaintiffs, Lawson Bast, et al.; James E. Cullum, Glens Falls, N. Y., of counsel.

Mazza, Williamson & Clune, Ithaca, N. Y., for plaintiff, Empire Livestock; Robert I. Williamson, Ithaca, N. Y., of counsel.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., for defendant, Marine Midland Bank; Paul B. Zuydhoek, and William J. Brown, Buffalo, N. Y., of counsel.

Bersani & Marshall, Syracuse, N. Y., for defendant, Orange Meat Packing; Keith Wolfe, Syracuse, N. Y., of counsel.

Stephen D. Gerling, Utica, N. Y., for Defendant, Trustee.

Gustave J. Di Bianco, Asst. U. S. Atty., Syracuse, N. Y., for amicus curiae; Joanne Schwartz, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

LEON J. MARKETOS, Bankruptcy Judge.

### Statement of the Case

On February 25, 1980, three creditors, the Marine Midland, N. A., Land O'Lakes, Inc., and Hansel-N Gretel Brand, Inc., pursuant to § 303(b)(1) of the Bankruptcy Code, 11 U.S.C. § 303(b)(1) (Supp. IV 1980), filed an involuntary petition in bankruptcy alleging the requisite jurisdictional allegations against G & L Packing Co., Inc. (hereinafter, "Debtor") which is a meat packing concern. The petition prays for an order for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 et seq. (Supp. IV 1980) against the Debtor. The Debtor filed its answer to the petition on March 17, 1980. The Debtor's answer admitted the principal allegations of the petition and contested upon lack of information and belief only the amount of the claims by Marine Midland Bank, N. A. and Hansel-N Gretel Brand, Inc. Accordingly, on March 24, 1980, this Court entered an order, pursuant to Bankruptcy Code § 303(h), 11 U.S.C. § 303(h), finding the principal allegations not timely controverted by the Debtor and granting the order for relief sought by the petitioners. The Court's order directed the Debtor to file its schedules and a statement of affairs, and appointed Stephen D. Gerling (hereinafter, "Trustee") as trustee of the estate of the Debtor.

On April 15, 1980, the business concerns of Lawson Bast d/b/a Bast's Livestock Exchange, Cambridge Valley Livestock Market, Inc., D. R. Chambers & Sons, Inc., Maplehurst Livestock Market, Inc., Millers Livestock Market, Inc., Mohawk Valley Commission Sales, Inc., Hicks and Spingler Livestock, Inc. d/b/a Sennett Sales, J. Lawrence Fobare and Mary P. Fobare d/b/a Seymours Commission Sales, Welch Livestock Market, Inc., and John D. Hendricks d/b/a Village Farm (hereinafter, collectively "Bast Group") joined together as plaintiffs and filed a single complaint commencing an adversary proceeding against Orange Meat Packing Co., Inc. (hereinafter, "Orange"), Marine Midland Bank, N.A. (hereinafter, "Bank"), and the Trustee.

The amended complaint of April 28, 1980, alleges six (6) causes of action. Basically, the allegations state that the Bast Group (1) are cash sellers of livestock within the meaning of the Packers and Stockyards Act, 1921, as amended, Pub.L.No.94–410, 90 Stat. 1249 (1976) (hereinafter, the "P & S Act"), codified at 7 U.S.C. § 181 et seq. (1976); (2) made cash sales of livestock and delivered the same to Orange from on or about December 24, 1979 to on or about January 8, 1980 in the approximate aggregate sum of $254,956.43; and (3) remains unpaid to date. Furthermore, it is alleged that (4) Orange was engaged in the business of buying livestock in commerce for the purposes of slaughter and was a "packer" under the provisions of the P & S Act; (5) the Debtor was engaged in the business of buying livestock in commerce for the purposes of slaughter and of manufacturing or preparing meat or meat products for sale or shipment in commerce and was also a "packer" within and subject to the P & S Act; (6) both the Debtor and Orange had average annual purchases exceeding $500,000.00; (7) that pursuant to P & S Act § 206(b), 7 U.S.C. § 196(b), the Bast Group has given written notices to Orange that they were unpaid, were preserving their P & S Act statutory trust interests; and (8) the Bast Group had duly filed such notices with the United States Secretary of Agriculture.

The complaint goes on to state that subsequent to its sales of livestock to Orange, such livestock, inventories of meat, and meat food products derived therefrom were delivered to the Debtor. Orange remains unpaid from the Debtor for the aforesaid deliveries. It is further alleged that (1) the Debtor sold such deliveries to various customers and obtained proceeds which are now impressed by operation of law with the

statutory trust for the benefit of the Bast Group pursuant to the P & S Act, and (2) both Orange and the Debtor have failed to hold all of the livestock, inventories, and/or receivables or proceeds therefrom in trust for the benefit of the Bast Group, as unpaid cash sellers under the P & S Act. Lastly, the Bast Group concludes that the livestock, inventories, accounts receivable, and proceeds from sales of livestock are *not* assets of the Debtor under the Bankruptcy Code, and that therefore, no title passed to the Trustee of the Debtor.

The Bast Group also alleges that the Bank and the Debtor entered into a security agreement whereby the Debtor's accounts receivable were pledged as collateral for the repayment of monies owing to the Bank pursuant to a promissory note. Furthermore, the various customers of the Debtor who owed the Debtor payments from livestock sold by the Debtor have made such payments directly to the Bank in an amount in excess of $270,000.00. Lastly, the Bast Group alleges such payments, as proceeds of the livestock, are part of the P & S Act's trust for the benefit of unpaid cash sellers such as the Bast Group and are being wrongfully retained and not paid into the trust by the Bank.

The second through sixth causes of action propose alternative legal theories of recovery from the Debtor's accounts receivable or the proceeds derived from the Bast Group's cash sales of livestock to Orange. These theories are: (1) Orange and the Debtor have such attributes between them that they constitute a single integrated entity for purposes of the P & S Act trust provisions which thereby makes the liability of Orange that of the Debtor; (2) the Debtor was the agent of Orange for the purpose of (a) selling the livestock and products derived therefrom, and (b) collecting of proceeds from such sales in order to make final payment to Orange, and therefore, all proceeds collected by the Debtor belong to Orange and are part of the statutory trust created by the P & S Act for the benefit of the Bast Group; (3) since the Debtor employed Orange as its agent for the purchase of livestock from the Bast Group, all Bast Group sales of livestock and all notices to, and claims against Orange constitute sales, notices, and claims against the Debtor.

On May 2, 1980, the Empire Livestock Marketing Cooperative, Inc. (hereinafter, "Empire") filed a complaint commencing an adversary proceeding against the Trustee, Orange, and the Bank. Its amended complaint of May 8, 1980, alleged five (5) causes of action. In essence, Empire also alleges it was a cash seller and statutory beneficiary qualifying under the P & S Act. Empire's particularized allegations are (1) it made cash sales of livestock to Orange covering the period of December 20, 1979 to and through January 8, 1980; (2) such sales occurred at its various markets in the State of New York; (3) such sales total approximately $368,721.30; and (4) it remains unpaid for said cash sales of livestock. It is further alleged that (5) Empire has given timely written notice to Orange *and* the Debtor that it is unpaid in the amount of $368,721.30 and was preserving its trust interests under the P & S Act; and (6) Empire had duly filed its claim with the United States Department of Agriculture, Packers & Stockyards Administration, in accordance with the P & S Act. Empire's four remaining "causes of action" are the same legal theories proffered by the Bast Group.

The Bast Group and Empire both pray for the following relief: (1) Declaring that all livestock, inventories thereof, receivables or proceeds from meat, meat food products, or livestock products derived, as well as to be received in future collections therefrom, are held in trust by the defendants, Orange, the Bank, and the Trustee, for the benefit of the Bast Group and Empire, as unpaid cash sellers of livestock; (2) directing Orange and the Debtor to hold in trust all monies subject to the statutory trust; (3) declaring the statutory trust applicable to the monies already collected by the Bank as receivables or proceeds from meat, meat food products, etc., derived from livestock or inventories of Orange *or* the Debtor; (4) directing an accounting by the Bank for the sums received by it from the receivables or proceeds from meat, meat food products,

etc. derived from livestock or inventories of Orange *or* the Debtor; (5) directing payment into the statutory trust fund by the Bank of all sums subject thereto; (6) declaring that the amount of the statutory trust fund and any interest therefrom be *exclusive of this bankruptcy proceeding* and not constitute an asset of the Debtor which passes title to the Trustee; (7) adjudicating the Bast Group and Empire claims against the trust fund and providing for distribution thereof; (8) appointing a trustee of the statutory trust, if necessary, to handle the trust fund and administer the procedures incident to these trust beneficiaries claims; (9) modify any stay under Bankruptcy Code § 362, 11 U.S.C. § 362, to allow adjudication of these issues, and (10) granting to the Bast Group and Empire their costs, disbursements, and reasonable attorneys' fees pertaining to these proceedings.

The Bank and the Trustee duly filed their answers to the Bast Group and Empire complaints controverting, by denial, the principal allegations and praying for dismissal of each amended complaint plus costs and disbursements, respectively. The named defendant, Orange filed an answer admitting almost all of the Bast Group allegations and requesting that the complaint's prayer for judgment be granted. Orange did not file an answer to the Empire complaint. The Bank's answer interposes four (4) defenses. These defenses are that (1) the complaint fails to state a claim against the Bank upon which relief can be granted; (2) pursuant to 12 U.S.C. § 94, the venue is improper respecting the property of the Bank; (3) the bankruptcy court does not have jurisdiction over property which is in the control of the Bank since such property is not, and it would not, become part of the Debtor's estate; and (4) the plaintiffs, Bast Group and Empire, failed to comply with the trust notice provisions of the P & S Act, as amended. The Bank's third defense was formally stricken from both adversary proceedings by this Court's orders of January 5, and February 19, 1981. Prior to trial, the Bank informed the Court it was waiving its

second defense premised on 12 U.S.C. § 94 as to proper venue in these adversary proceedings.

## FINDINGS OF FACT

Prior to the trial of these adversary proceedings, the parties were able to resolve in a binding stipulation of facts (hereinafter, "STIP."), the potential plethora of factual issues raised by the pleadings. The Trustee signed the Stipulation taking exception only to paragraphs 19 and 20. The trials of both the Bast Group and Empire actions were conducted jointly.* The trial was held on September 23rd, 24th, and 25th, 1981 and heretofore the three volume Transcript will be referred to by the citation "I–T. page", and "II–T. page" and "III–T. page", respectively. The Exhibits were marked as follows: The Bank's exhibits were denominated "Defendant's Exhibit letter-2" (hereinafter, "Def. Ex. letter-2") while the Bast Group labelled its exhibits "Plaintiff-1-number" (hereinafter, "P–1 Ex. number"). For the purposes of continuity, both stipulated fact and the Court's findings of fact appear in their chronological order. They are as follows:

1. The Debtor is a corporation organized and existing under the laws of New York since 1955. Its sole plant site and principal place of business is in New York Mills, Oneida County, New York. (Stip. ¶ 3, 6) (I–T. 46, 47, 114). Since June 20, 1978, Franklin B. Giruzzi has been its President and his brother, John Giruzzi, has been its Secretary-Treasurer. (Stip. ¶ 7). John Giruzzi's principal duties for the Debtor are in the area of sales. (I–T. 35, 38). Franklin Giruzzi was the day-to-day manager of the Debtor's operations at the plant and made all the business decisions for the Debtor for the period of 1977–80. (I–T. 38, 69). On March 27, 1977 the Debtor executed an eight year consulting contract with Harmin Management Consultants, Inc. (Stip. ¶ 9).

2. The Debtor was a wholesale boneless meat company, a processor, and a purveyor of provisions. It sold its products to stores, hotels, and restaurants. (I–T. 36). The

---

* The parties' Stipulation of Facts was received into evidence. (II–T. 139).

Debtor would purchase from slaughterers, carcasses of "native" and "steer" beef, debone them, and sell those cuts of beef. (*Id.* 36, 37). It also sold such items as meatloaf and bologna as a purveyor. (I–T. 36). Approximately ninety-five percent (95%) of the Debtor's business consisted of boneless beef sales. (*Id.* at 37). The Debtor's selling of "native" beef constituted 90–95% of the boneless beef portion of the Debtor's business. (I–T. 38, 71). The Debtor's average annual purchases from slaughterers exceeded $500,000.00. (Stip. ¶ 16). The Debtor's activities in the business of manufacturing or preparing meats or meat food products for sale or shipment in commerce included the period from on or about October 1, 1979 through January 8, 1980. (Stip. ¶ 14).

3. The Debtor's financial banking history was quite consistent. The Debtor maintained business with the Bank and its predecessors for some forty (40) years. (I–T. 75). Franklin Giruzzi, as President of the Debtor, dealt with the Bank. (*Id.*) Mr. Gary Fowler, a loan officer of the Bank, was the person with whom Franklin Giruzzi principally conducted the Debtor's banking affairs through the years of 1978 to 1979. (*Id.* at 75–76, 154). On June 21, 1977, the Debtor arranged additional financing by executing a demand promissory note to the Bank in the sum of $600,000.00 premised on the Debtor's accounts receivable as collateral. (Stip. ¶ 18). A prior bond and mortgage covered the Debtor's plant. (Stip. ¶ 17).

4. On December 15, 1978, the Debtor established a one million dollar line of credit at the Bank secured by the Debtor granting a blanket security interest covering its present and future inventories, accounts receivable, and contract rights. (Stip. ¶ 18, ¶ 19). The Bank perfected its security interest by proper and timely filing. (Stip. ¶ 20). The Bank would offer this line of credit by "advancing" loans against eighty percent (80%) of the accounts receivable supplied to the Bank in the form of assigned invoices or actual payments from customers of the Debtor. (II–T. 4, 7). The line of credit advances were given to the Debtor upon the Debtor's request by crediting to its corporate checking account which was maintained with the Bank's Buffalo offices. (Stip. ¶ 11, I–T. 167, II–T. 4). The loan's balance would fluctuate with daily reduction payments by checks (I–T. 173–74).

5. Franklin Giruzzi was familiar with the needs of the Debtor for slaughtered livestock. (I–T. 72). Along with the industry nationwide, the Debtor suffered economically from a shortage of slaughtered native beef supply in 1978–79. (I–T. 40–41, 73). The Debtor needed an assured supply of slaughtered native beef to maintain profitable operations. (*Id.*). Franklin Giruzzi envisioned that the Debtor could control its own destiny if it entered into the slaughtering business. (I–T. 73–74). The Debtor hired Mr. Gerald Naistadt, a former principal to a defunct slaughtering concern named Dewitt Packing Company, in order to acquire information as to its former plant site. Mr. Naistadt was hired in the middle of 1978. (I–T. 77–78).

6. In the years prior to 1979, the Debtor had purchased its native beef from various slaughtering suppliers. The Utica Veal Company was a primary supplier to the Debtor. (I–T. 55). Utica Veal sustained a fire in April, 1979. (P–1 Ex. 2, I–T. 55). Its operations were cut down to 25–30% of volume for several months (Def. Ex. II–2 at pp. 40–41) and such events had a considerable impact on the Debtor. (*Id.*)

7. The Bank was the Debtor's primary lending institution for working capital-cash flow needs. The Bank had manifested its disinterest in financing a slaughtering concern. (I–T. 83–84, 154). Franklin Giruzzi originally wanted the Debtor to enter slaughtering operations as one corporation (I–T. 90), but he perceived that the Debtor, itself, could not expand to slaughtering without jeopardizing its financing relationship with the Bank. (I–T. 83–84, 88, 111–112, P–1 Ex. 2). Franklin Giruzzi directed Mr. Gross, the Debtor's management consultant, to meet with the Bank's Mr. Fowler who handled the Debtor's commercial finance account. (I–T. 92–93, 154).

8. In the Spring of 1979, Mr. Gross told Mr. Fowler that there would be no direct ownership by principals of the Debtor of the proposed slaughterer corporation. (I–T. 190, P–1 Ex. 2). Mr. Fowler expressed a concern as to the P & S Act's trust provisions being applied to the Debtor's operations. (I–T. 157, P–1 Ex. 2). The Debtor's dependence on the Bank's financing primarily motivated the establishment of a second, apparently non-associated corporation. (I–T. 90–91). Later, the attorneys for Orange also informed the Bank that (1) Angela Giruzzi would be Orange's sole shareholder, sole officer, and member of the Board of Directors, and (2) to their knowledge, "Franklin Giruzzi has no interest in said corporation or the business transacted by said corporation." (Def. Ex. M–2).

9. Despite the Bank's subsequently expressed concern about transactions between the Debtor and Orange which it knew to be companies interrelated through common family ownership (P–1 Ex. 1, 3), knowledge of the occurrences of such transactions and the failure to supply to the Bank certain requested assurances from the Packers and Stockyards Administration did not curtail the Bank's financing of the Debtor. (I–T. 163, 175, 204).

10. The defendant, Orange, is a corporation organized and legally still existing under the state laws of New York since incorporation on August 28, 1979 with its plant and offices located in Dewitt, Onondaga County, New York. (Stip. ¶ 2, 6). Mrs. Angela Giruzzi, wife of Franklin B. Giruzzi, is the President, sole director, and sole stockholder of Orange. (Stip. ¶ 8). Mrs. Giruzzi's positions with Orange provide to her no salary, no dividends, no income whatsoever. (I–T. 6, 9). In fact, Mrs. Giruzzi testified that she never made any personal contribution of monies for Orange. (*Id.*) She has no ownership or position in the Debtor. (I–T. 5, 146).

11. The origins and extent of investment capitalization for Orange are not clearly demonstrated in the evidence. Besides beef carcass, a slaughterer's by-products, *e.g.*, hides, are marketable items. The minimal proof was that pre-payments for by-products by hide and skin customers of Orange were the source of monies ($50,000.) to get Orange going. (Def. Ex. EE–2 p. 2 ¶ 6, Ex. II–2 pp. 53–54, P–1 Ex. 2). Supposedly, a bank working capital line of $350,000. *was to be* acquired. (P–1 Ex. 2).

12. Mrs. Giruzzi testified that she was unfamiliar with such facts as Orange's outstanding shares of stock, who were Orange's attorneys or accountants, that she was its only director, any director meetings, the minutes of the corporation, or the certificate of incorporation. (I–T. 4–10, 25). Her participation in the operations of Orange was limited to affixing her signature at her home to all Orange checks, both blank and in completed form according to her husband's instructions. (I–T. 6–7, 15). Documentary evidence shows Mrs. Giruzzi also signed a loan application, and on October 1, 1979 she executed a management consulting contract with Management Consultants, Inc. for Orange (Def. Ex. B–2, C–2, Stip. ¶ 10) according to her husband's direction. (I–T. 28). Mrs. Giruzzi usually did not read before signing the aforesaid documents nor did she know their particular purpose when executing them. (I–T. 16–17, 26, 28). Although she signed payroll checks, Mrs. Giruzzi did not hire Orange's employees. (I–T. 12, 27).

13. John Giruzzi testified that he observed that Franklin Giruzzi conducted the management of Orange (I–T. 40) until it closed. (*Id.* at 60). Everybody in the Orange plant was under Franklin Giruzzi's supervision according to Orange's management consultant (Def. Ex. II–2 at p. 73) even while Franklin Giruzzi simultaneously ran the Debtor's operations.

14. Although holding no formal corporate position with Orange (I–T. 95), Franklin Giruzzi had a pervasive control over the establishment and operations of Orange. He was responsible for (1) utilizing the Debtor's employees (without objection from the Debtor's co-owner (I–T. 44)) to transport and install automated kill floor ma-

chinery, check refrigeration problems, set up a bookkeeping system at the Orange plant at the expense of the Debtor (I–T. 43–45, 80–82) besides supervising Orange's 5–10 employees (I–T. 60); (2) furnishing a special "Com-Key" telephone line between the Debtor and Orange to avoid long distance charges with the Debtor bearing this expense (I–T. 105–106); (3) instructing Orange buyers of cattle what livestock and at what price *he* expected them to purchase (I–T. 95, 149–150); (4) setting the price for slaughtered livestock sold to the Debtor from Orange in such a way that profit to Orange was *not* an absolute goal so long as the *overall operation of Orange and the Debtor* produced a net profit. (I–T. 108–110). Although not compensated by or on the Orange payroll, Franklin Giruzzi was physically present at Orange every day but for a short chat with his brother John at the Debtor's plant before traveling to the Orange plant. This pattern continued up until Orange closed in January of 1980. (I–T. 44, 60–61, 67, 81, 94).

15. From sometime during October, 1979, to on or about January 8, 1980, Orange was engaged in the business of buying livestock in commerce for the purposes of slaughter within the meaning and subject to the provisions of the P & S Act. The average annual purchases of Orange exceeded $500,-000.00 (Stip. ¶ 13, 15). From its purchases of livestock, Orange's business was a composite of sales. The sales of red meat carcasses made up ninety-five percent (95%) of volume; by-products were five percent (5%) of volume. (I–T. 149).

16. The Orange facilities for livestock slaughtering are in a slaughtering plant formerly used by the defunct concern called Dewitt Packing Company. (I–T. 62–63). Orange occupied these facilities by virtue of an arrangement with Key Bank of Central New York which holds a mortgage on these premises. (I–T. 78). The agreement between these parties was finalized in May or June, 1979. (I–T. 80). Basically, the Key Bank allowed Orange one year to establish itself as a viable operating slaughterer before Orange would be obligated to pay any monthly mortgage payments on a future Orange mortgage. (I–T. 77–80, 142). Or-

ange also maintained its corporate checking account at Key Bank. (Stip. ¶ 12).

17. A standard procedure was set up when Orange's checking account at Key Bank, Syracuse, met with a presentment of checks which created an overdraft on its account. The Debtor would permit the wiring of funds to cover those overdrafts from its corporate checking account at the Bank's Buffalo office to Orange's Syracuse Key Bank. Such transfers occurred when Mr. Closson, the Debtor's comptroller, would check to determine as to Orange's overdraft liability for the day. (I–T. 103–05, 169, II–T. 5–6). Such wired funds covered the payment to the livestock sellers to Orange. (I–T. 105).

18. The Bast Group and Empire are sellers of livestock. (Stip. ¶ 1). Empire is a corporation under the state laws of New York. (Stip. ¶ 26). Each member of the Bast Group and Empire (collectively through its various branch auction markets throughout New York State) conduct commission sales of livestock for farmers. (II–T. 101, 144, 146, 148, 152, 172–73, 191). The farmers bring the "native" cattle livestock to these auction houses where buyers, such as Orange, bid for the cattle. (II–T. 92, 100–101, 133). After the highest bidder has purchased the livestock, the Bast Group and Empire make out a bill of sale indicating and identifying the particular cattle bought. (II–T. 114–116, 192, 197–98). The Bast Group and Empire immediately, within 24 hours, pay the farmers by mailed check. (II–T. 102, 147, 152, 166–67, 173, 192). Then, Bast Group and Empire await payment within 24 hours by the buyers. (*Id.* at 103, 167, 173, *cf.* 153). As in the normal case of buyers' mode of payment, Orange would either pay by check on the day of its purchase or it would mail a check to the auction house of Empire or Bast et al. (II–T. 92, 112, 117, 144, *cf.* 147).

19. The Bast Group sold livestock to Orange on or about October 29, 1979 through January 8, 1980. (Stip. ¶ 35). The Bast Group rendered invoices to Orange for each

sale of livestock. The sales for which Bast et al. according to each individual plaintiff-seller, have not received payment from Orange are stipulated to be:

| Seller | Date of Purchase | Amount | Preservation of Trust |
|--------|------------------|--------|-----------------------|
| Lawson Bast d/b/a Bast's Livestock Exchange | 1/02/80 | $ 9,240.15 | Admitted |
| Cambridge Valley Livestock Market, Inc. | 12/26/79 | 14,223.94 | Admitted |
| | 1/02/80 | 15,507.97 | Admitted |
| | 1/08/80 | 15,616.49 | Admitted |
| D. R. Chambers & Sons, Inc. | 1/02/80 | 6,033.64 | Admitted |
| Lewis County Livestock Market, Inc. | 12/31/79 | 11,981.38 | Denied |
| | 1/03/80 | 10,303.96 | Admitted |
| | 1/07/80 | 11,846.52 | Admitted |
| Maplehurst Livestock Market, Inc. | 12/24/79 | 8,887.36 | Admitted |
| | 1/07/80 | 25,339.37 | Denied |
| Millers Livestock Market, Inc. | 1/02/80 | 14,826.37 | Denied |
| Mohawk Valley Commission Sales, Inc. | 12/27/79 | 5,528.60 | Denied |
| | 12/31/79 | 9,861.60 | Denied |
| | 1/03/80 | 4,253.95 | Admitted |
| | 1/07/80 | 4,227.20 | Admitted |
| Hicks and Spingler Livestock Inc. d/b/a Sennett Sales | 12/27/79 | 18,197.52 | Admitted |
| | 1/03/80 | 20,041.38 | Admitted |
| J. Lawrence Fobare and Mary P. Fobare d/b/a Seymours Commission Sales | 12/26/79 | 9,938.36 | Denied |
| | 1/02/80 | 9,210.05 | Admitted |
| Welch Livestock Market, Inc. | 12/26/79 | 8,690.13 | Denied |
| | 1/02/80 | 11,357.74 | Denied |
| | 1/07/80 | 8,417.76 | Admitted |
| John G. Hendricks d/b/a Village Farm | 1/02/80 | 1,425.00 | Admitted |
| TOTAL | | $254,956.44 | |

20. With respect to the aforesaid purchases for which the "preservation of the trust" is "admitted", Bast et al made *cash sales* of livestock to Orange and timely filed trust notices with Orange and the Department of Agriculture. (Stip. ¶ 38–40).

21. The Empire concern also rendered invoices to Orange for each sale of livestock. The total amount of dollar volume in those sales commencing on December 20, 1979, and continuing through January 8, 1980, for which Empire was not paid or was paid but the checks were subsequently dishonored for insufficient funds is the amount of $368,720.30. Those purchases by Orange for which Empire, collectively through its branch markets, has not been paid are stipulated to be:

| Branch Market | Date of Purchase | Amount | Preservation of Trust |
|---------------|------------------|--------|-----------------------|
| Bath | 12/27/79 | $ 23,942.50 | Denied |
| | 1/03/80 | 19,826.49 | Admitted |
| Lowville | 12/31/79 | 6,280.36 | Admitted |
| | 1/07/80 | 6,007.57 | Admitted |

| Branch Market | Date of Purchase | Amount | Preservation of Trust |
|---|---|---|---|
| Pavilion | 12/31/79 | $ 10,947.07 | Denied |
|  | 1/02/80 | 16,279.32 | Admitted |
|  | 1/07/80 | 33,765.45 | Admitted |
| Dryden | 1/02/80 | 13,209.20 | Denied |
|  | 1/07/80 | 30,531.81 | Admitted |
| Oneonta | 12/27/79 | 36,789.51 | Denied |
|  | 1/03/80 | 56,940.92 | Admitted |
| Caledonia | 1/01/80 | 14,814.01 | Denied |
|  | 1/08/80 | 26,032.43 | Admitted |
| Adams | 12/20/79 | 6,766.55 | Denied |
|  | 12/27/79 | 14,698.88 | Denied |
|  | 12/31/79 | 5,596.31 | Denied |
|  | 1/03/80 | 3,510.83 | Admitted |
|  | 1/07/80 | 6,235.20 | Admitted |
| Cobleskill | 12/27/79 | 6,021.17 | Admitted |
|  | 1/01/80 | 6,233.37 | Denied |
|  | 1/01/80 | 10,732.72 | Admitted |
| Gouverneur | 1/01/80 | 3,743.30 | Admitted |
|  | 1/08/80 | 9,826.33 | Admitted |
|  |  | $368,720.30 |  |

22. With respect to the aforesaid purchases for which the "preservation of the trust" is "admitted", Empire made *cash sales* of livestock to Orange and timely filed trust notices with Orange and the Department of Agriculture. (Stip. ¶ 30, 32–34).

23. Besides the printed form invoices' "TERMS: CASH", several of the Empire invoices to Orange contain a handwritten notation of "Chg." or "Charge". (Def. Ex. V–2 through BB–2). Such invoices were written out by clerks of the local markets of Empire on the day of sale. (II–T. 199). Mr. Nelson, the comptroller for Empire, testified that as an officer of Empire he'd be aware if there was any approval of credit concerning Empire's sales of livestock to Orange. (II–T. 183, 189). He further testified that Empire never expressly granted credit to Orange in any oral or written form. (*Id.* at 184–185). The witness' explanation for invoice notations such as "chg." or "charge" was that such notation means that the sales invoice was not paid the day of the sale. Absence of such notation signifies delivery of a check on the day of the sale. (II–T. 213, 220–21).

24. The Bank denies preservation of alleged trust interests of six (6) individual sellers in the Bast Group. *See* Findings of Fact ¶ 19, *supra*. Testimony by the officers or partners of those particular auction markets established that according to that witness' knowledge and scope of authority its livestock auction market did not expressly extend credit by either oral or written agreement. (II–T. 95, 123, 139–40, 150, 165, 171, 177–78). Franklin Giruzzi testified that Orange never entered into any extensions of credit with the Bast Group or Empire. (I–T. 97).

25. The accurate data concerning facts of date of sale, transfer of possession, mode of payment, date on which payment instrument (check) was presented, date of receipt of notice of instrument's dishonor, and date of sending trust notices to Orange and United States Department of Agriculture for both Empire and Bast Group transactions of livestock with Orange are stipulated fact embodied in the Exhibits "A" and "C" of the Stipulation. (Stip. ¶ 29, ¶ 37). The Empire markets in Ex. "A" are titled by abbreviations as follows: Adams (AD), Bath (BA), Caledonia (CA), Cobleskill (CO), Dryden (DR), Gouverneur (GO), Lowville (LO), Oneonta (ON), Pavilion (DA) (sic). (II–T. 190–191).

26. Empire customers make payment to the individual Empire markets. (II–T. 193). The checks of Orange numbered 928, 930,

931, and 1032 were presented to Empire's markets at Cobleskill ($6,021.17), Oneonta ($36,789.51), Bath ($23,942.50), and Pavilion ($10,947.07), respectively. Subsequently, each check was dishonored by Key Bank for insufficient funds. The individual managers of the aforesaid Empire markets received telephonic notice of dishonor from the depository bank of each market. Those banks were reimbursed by each market for the amounts of the checks (Stip. Ex. B) no later than January 14, 1980. The corresponding livestock purchases at each market occurred on December 27, 1979, except at Pavilion it was on December 31, 1979. (Stip. Ex. A).

27. The Maplehurst Livestock Market, Inc. also received a telephonic notice of dishonor on January 11, 1980 concerning the check covering the Orange purchase of December 24, 1979. The subsequent purchase of January 7, 1980, also was paid by mailed check. Having had the prior check dishonored, Mr. Kent of Maplehurst thought Orange was "out of business" and so Maplehurst never presented the check dated January 7th, 1980, in any attempt to receive payment. The check was not written for the correct amount of $25,339.57, but rather for the amount of $41,254.00. (II–T. 156, 160–63, Def. Ex. T–2, Def. Ex. U–2–(A through C).

28. The testimony of several Bast Group members bears out the general fact that purchaser-slaughterers, *e.g.*, Orange, are responsible for trucking their purchased livestock from the auction market to their respective slaughterhouses. (II–T. 116, 124, 147, 173–74).

29. The daily working capital needs of Orange were not minimal. A review of the stipulated facts narrates that daily purchases of native livestock from the Bast Group and Empire involved sizeable amounts in demand instruments (checks), *e.g.*, November 12, 1979 ($100,672.53); December 10, 1979 ($80,442.87); December 27, 1979 ($122,686.26); January 7, 1980 ($126,371.08). (Stip. Ex. "A" and "C").

30. The Debtor started to buy nonexclusively from Orange in late September, 1979. (I–T. 41, 42). As of early October, 1979, the Debtor acquired *most* of its needed native beef supply from Orange. As of December 5, 1979, the Debtor's records narrate that 100% of its supply of native beef came from Orange. (I–T. 42–43, III–T. 33). From October, 1979 and onward, the slaughtered beef of Orange was transported from Dewitt, New York to the Debtor's plant by the Debtor's leased trucks at Debtor's expense. (I–T. 43, 46). The Debtor's percentage of "native" beef deboning increased when Orange entered the picture, yet it still continued to purchase "steer" beef. (I–T. 54–55).

31. Although the industry-wide open market price ("yellow") sheets were utilized by the Debtor when deciding what purchase price it would offer to its suppliers of slaughtered cattle (I–T. 50–52, 134–35, II–T. 65), such sheets were *not* the absolute determinant when Franklin Giruzzi set the purchase prices to be paid by the Debtor to Orange. (I–T. 57, 109–110).

32. In a businesslike fashion, Orange did send invoices covering the Debtor's purchases. (I–T. 110, II–T. 67, 69). According to the Debtor's records, it would pay its different supplier-vendors, including Orange, either by check or direct wire transfer. (I–T. 136–37, II–T. 4–5, III–T. 26–27). The Debtor made wire transfers from its Marine checking account to Orange's Key Bank account starting on November 15, 1979 through January 7, 1980. (Stip. ¶ 24, ¶ 25). The evidence as to the amounts of these transfers is a total of $2,324,190.51. (P–1 Ex. 5).

33. By testimony of an accounting expert witness, the Bank presented its evidence concerning a determination of the relationship between the Debtor and Orange. The witness reviewed various transactional journals, a general ledger, accounting, and bookkeeping records of the Debtor (III–T. 18) and a somewhat less extensive, but separate set of Orange records which only consisted of bank statements, check copies, and records of disbursements. (*Id.* at 15, 20). Although the witness did have the Debtor's financial statements for the fiscal years June, 1978 and 1979, there were no financial accounting statements for Orange. (*Id.* at

37, 41). The witness had no knowledge of who ran the day-to-day operations of the Debtor or Orange. (*Id.* at 49–50).

34. From review of the *available* records of both corporations, the Bank's witness expressed his expert opinion that (1) he did not observe any co-mingling of funds between the two corporations (III–T. 21–22, 24); (2) there was a vendor-customer relationship between Orange and the Debtor (*Id.* at 25, 35–36); (3) the records reviewed did not indicate that the Debtor and Orange acted as other than separate and distinct companies (*Id.* at 36); (4) the records of Orange were unclear, but it appeared that the Debtor owed Orange, according to unpaid invoices, an aggregate sum of at least $488,113.72 (*Id.* at 30–31); and (5) the first such unpaid invoice from Orange to the Debtor was dated 1/03/80. (*Id.* at 29–30). Upon cross-examination, the witness' opinions were qualified. Admittedly, other possible yet absent records of Orange would have further assisted the witness in determining co-mingling of funds of these two corporations. (*Id.* at 43–44). It was questionable whether Orange kept accounting records which are ordinarily kept by a corporation. (*Id.*).

35. The Bank's witness was also requested to make a comparison of the purchase prices paid by the Debtor to Orange vis-a-vis prices the Debtor paid to other native beef suppliers (III–T. 31–32) and the prevailing market *unit price* for similar product items. The comparison encompassed ten (10) invoices covering the period November 1–December 5, 1979, between the Debtor and its two beef carcass suppliers, Orange and a concern named Party Packing Company. (*Id.* at 32–33). Concerning eleven of fourteen items, prices were identical. The other three items differed by one penny per unit price. (*Id.* at 33). The witness also observed the Debtor's records made an unex-

plained $25,000.00 reduction to accounts payable invoices to Orange. (*Id.* at 31, 45). Other invoices from Orange had partial payments applied leaving an outstanding sum of $33,193.05. (*Id.* at 31). The one cent (1¢) unit price differentials were per pound of multi-hundred pound purchased cows. (*Id.* at 46).

36. During the period of December 24, 1979 through February 25, 1980, the Bank received, both directly and indirectly, customer payments owing to the Debtor for its sales of boneless meats and provisions. (Stip. ¶ 23). The Bank routinely applied such payments to the Debtor's $1,000,000.00 line of credit. (I–T. 169–173, P–1 Ex. 4). During such period, the total customer revenues applied to the accounts receivable line of credit was $2,085,518.20. As of January 21, 1980 through February 25, 1980, all such amounts applied came directly from the Debtor's customers. (Stip. ¶ 23). Sometime in January 1980, Marine's Mr. Fowler had been advised of a temporary restraining order by the U. S. District Court (*United States of America v. Orange Meat Packing Co., Inc. and G & L Packing Co., Inc.*, Case No. 80–CV–101 (N.D.N.Y. January 29, 1980)) in connection with the receivables of the Debtor and Orange. (I–T. 174–75). Between January 8, 1980 through March 3, 1980, the Bank progressively reduced the Debtor's accounts receivable line of credit from $987,361.32 to an ending balance of $405,166.46 amounting to collections of $582,219.86. (P–1 Ex. 4).

## DISCUSSION

Premised on alleged rights under a federal statutory trust, these adversary proceedings present a situation where unsecured creditors (the Bast Group and Empire) of Orange seek to exclude from and recoup the accounts receivable of the bankruptcy estate[1] of the Debtor. In opposition, the

1. The property of the estate consists of a debtor's interests as defined by § 541 of the Bankruptcy Code, 11 U.S.C. § 541 (Supp. IV 1980). The Code's legislative history makes express reference to statutory trusts which in operation exclude property from the debtor's estate. It is stated:

This section [541] ... also will not affect various statutory provisions that ... creates [sic] a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act § 206, 7 U.S.C. 196.

H.R.Rep.No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep.No. 989, 95th Cong., 2d Sess. 82

Bank, as a secured creditor of the Debtor corporation, looks to the very same property as its collateral security under an accounts receivable financing arrangement between it and the Debtor.[2]

The case at bar concerns a unique factual situation in the present status of decisions decided under the Packers & Stockyards Act, 1921, *as amended by* Pub.L. No.94–410, 90 Stat. 1249 (1976), *codified at* 7 U.S.C. § 181 *et seq.* (1976).[3] That federal statute provides cash sellers of livestock with a federal legal right[4] to enforce a trust on livestock or its many derivative forms and monetary proceeds held by the purchasing customer. As beneficiaries of the statutory trust, Congress intended unpaid cash sellers to satisfy their claims from the packer's assets (inventoried livestock delivered by the cash seller and accounts receivable and other proceeds from the sale of such livestock) before satisfying any [Uniform Commercial Code] Article 9 perfected security interest in those assets. *Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008, 1022 (E.D.Pa.1978); *Hedrick v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1025, 1030 (E.D.Pa.1978). In this case, the Bast Group and Empire seek to impress the statutory trust on accounts receivable owing to a meat processing concern, the Debt-or, although the Debtor is a separate corporation from the slaughtering corporation, Orange, to which the Bast Group and Empire had directly made their sales of livestock.

The Bast Group and Empire's alleged federal trust rights arise under § 206, subsection (b) and (c) of the P & S Act. They read as follows:

(b) All livestock purchased by a packer in *cash sales,* and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, *shall be held by such packer in trust for the benefit of all unpaid sellers* : Provided, That any packer whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this section. Payment shall not be considered to have been made if the seller receives a payment instrument which is dishonored: Provided, That the *unpaid seller shall lose the benefit of such trust if,* in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 409, *or* within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, *the*

(1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6324, 5868; *See also* 124 Cong.Rec. H 11,096 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S 17,413 (daily ed. Oct. 6, 1978).

**2.** To date, the Trustee has not litigated the validity of the Bank's security interest inasmuch as a decision for the Bast Group and Empire would effectively remove the Debtor's beneficial property interests in its accounts receivable which were collected post-petition.

**3.** The 1976 amendments of the Packers and Stockyards Act, 1921, embodied in the passage of Pub.L.No.94–410, were a direct response by Congress to the consequences of increased exposure of livestock producers to the risks created by certain business practices engaged in by members of the meat packing industry and the ramifications of those practices in packer bankruptcies. Prior to the 1976 amendments, a packer was able to offer as security for a loan the livestock, meat, meat food products, or receivables or proceeds therefrom for which he had not yet paid. Upon default on the loan, the producer, who was responsible for raising, and caring for the livestock, was left unpaid while secured creditors reaped the reward of the livestock producers' labors by foreclosure on their security. See S.Rep.No. 932, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2270–71.

Congress enacted statutory trust provisions which offer producers the best protection against packer bankruptcies. The producers shall receive their money, the money they expected to receive when on cash terms they sold their livestock, before secured creditors' interests which attached to the livestock collateral security. See S.Rep.No. 932, 94th Cong., 2d Sess. 13, *reprinted in* 1976 U.S.Code Cong. & Ad.News 2279.

**4.** The 1976 amendments, *supra,* grant an express private cause of action to seek damages for a violation of any provision of the P & S Act relating to the purchase, sale, or handling of livestock by any person subject to the P & S Act. *See* P & S Act § 308, 7 U.S.C. § 209 (1976).

*seller has not preserved his trust under this subsection.* The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

(c) For the purpose of this section, a *cash sale means* a sale in which the seller does not expressly extend credit to the buyer.

7 U.S.C. § 196 (Emphasis added). The section creates a trust relationship between a "packer" and "all unpaid cash sellers" of livestock until full payment has been received by the unpaid sellers.

By incorporation of § 409 of the P & S Act, the section contains specific time deadlines for payments with consequences to both the packer and unpaid seller. Section 409 reads:

Sec. 409(a) Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price: Provided, That each packer, market agency, or dealer purchasing livestock for slaughter shall, before the close of the next business day following purchase of livestock and transfer of possession thereof, actually deliver at the point of transfer of possession to the seller or his duly authorized representative a check or shall wire transfer funds to the seller's account for the full amount of the purchase price; or, in the case of a purchase on a carcass or "grade and yield" basis, the purchaser shall make payment by check at the point of transfer of possession or shall wire transfer funds to the seller's account for the full amount of the purchase price not later than the close of the first business day following determination of the purchase price: *Provided further, That if the seller* or his duly authorized representative *is not present to receive payment at the point* of transfer of possession, as herein provided, *the packer,* market agency or dealer *shall wire transfer funds or place a check in the United States* mail for the full amount of the purchase price, properly *addressed to the seller, within*

the time limits specified in this subsection, such action being deemed compliance with the requirement for prompt payment.

(b) Notwithstanding the provisions of subsection (a) of this section and subject to such terms and conditions as the Secretary may prescribe, *the parties to the purchase and sale of livestock may expressly agree in writing before such purchase or sale, to effect payment in a manner other than that required in subsection (a).* Any such agreement shall be disclosed in the records of any market agency or dealer selling the livestock, and in the purchaser's records and on the accounts or other documents issued by the purchaser relating to the transaction.

(c) Any delay or attempt to delay by a market agency, dealer, or packer purchasing livestock, the collection of funds as herein provided, or otherwise for the purpose of or resulting in extending the normal period of payment for such livestock shall be considered an "unfair practice" in violation of this Act. Nothing in this section shall be deemed to limit the meaning of the term "unfair practice" as used in this Act.

7 U.S.C. § 228b (Emphasis added). Undisputedly, Orange is a "packer" within the P & S Act with statutory trustee duties. (Stip. ¶ 13, ¶ 15). Although the Bast Group and Empire are not the persons who raise, feed, or produce the livestock, as middlemen, *i.e.,* commission sale auction markets, they will qualify as "sellers" under § 206 of the P & S Act, 7 U.S.C. § 196(b). *See In re Frosty Morn Meats, Inc.,* 7 B.R. 988, 998, 1019–22 (M.D.Tenn.1980).

There is no privity of contract by which Empire or the Bast Group can assert that the corporate Debtor directly purchased livestock from them. To overcome this obstacle, the Bast Group and Empire seek to join the corporations of the Debtor and Orange to form a single corporate entity-packer and to impress their statutory trust interests on the Debtor's assets. The Bast Group and Empire call upon this Court to apply the equitable "alter ego" or "mere

instrumentality" doctrine which disregards separate corporate entities.

## I.

The first legal issue posed by the Bank is a determination of the proper rule of decision, state or federal law, for purposes of disregarding and merging the two separately incorporated entities of Orange and the Debtor so as to (1) make the Debtor a P & S Act "packer" with Orange's statutory trustee duties, and (2) subject the Debtor's assets, i.e., accounts receivable, to the trust interests of the Bast Group and Empire. The Bank's position is that the synonymous doctrines of "mere instrumentality" or "piercing the corporate veil" or "alter ego" of corporate law under the state laws of New York constitute the controlling rule of decision.[5] Undeniably, Orange and the Debtor are New York corporations. The Bank cites Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) rev'g, 567 F.2d 1208 (2d Cir. 1978), as authority for its contention.

The Bank frames the Burks holding for a rule "that federal courts, as a matter of federal law, should apply state corporate law to the extent that the state law is consistent with the policies of the federal act under consideration." Bank's Trial Brief at 10. This statement is an oversimplification of the Burks holding which was not a review of choice of law principles for purposes of litigants who seek to enforce federal rights by piercing separate corporate veils to impose liability upon alternative parties.

This Court believes that the Bank's proposition on the choice of law which would bind the Bast Group and Empire follows from an out-of-context and oversimplified understanding of the Burks holding. The Supreme Court succinctly framed that case's issue as:

This case involves the question whether directors are authorized to determine that certain claims [here, a shareholders' derivative suit premised on implied causes of action under federal statutes] not be pursued on the corporation's behalf.

441 U.S. at 477–78, 99 S.Ct. at 1837. To resolve that question a preliminary legal issue had to be addressed: "(W)hich law-state or federal-governs the power of the corporation's disinterested directors to terminate this derivative suit." 441 U.S. at 475, 99 S.Ct. at 1835. It is in this posture that the Burks decision stated, as paraphrased by the Bank,

We hold today that federal courts should apply state law governing the authority of independent directors to discontinue derivative suits to the extent such law is consistent with the policies of the ICA [Investment Company Act] and IAA [Investment Advisors Act].

441 U.S. at 486, 99 S.Ct. at 1841. Such a holding nowhere speaks to the rule of decision for litigants who attempt to enforce federal rights and interests by employment of the doctrine of "piercing the corporate veil". Rather, the Burks holding clearly would stand for the principle of utilizing state law on corporate law issues pertaining to internal affairs of a corporation. Cf. Cort v. Ash, 422 U.S. 66, at 84, 95 S.Ct. 2080, at 2091, 45 L.Ed.2d 26 at 40 (1975) ("Corporations are creatures of state law, and ... except where federal law expressly requires ..., state law will govern the internal affairs of the corporation.") (Emphasis added).

■ This Court concludes that the Burks decision does not mandate that the Bast Group and Empire rely on the elements of New York state law concerning the remedial doctrine of disregarding separate corporate entities. Rather, "federal courts must be ever vigilant to insure that application of state law poses 'no significant threat to any

---

5. In contradistinction, it is questionable whether there is any established rule of decision for litigants who request a federal court to pierce or disregard the corporate veil in order to enforce federally created rights or interests. See generally Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine under Federal Common Law, 95 Harv.L.Rev. 853, at 859 (1982) ("The tension between state and federal interests under federal common law has led to much confusion, especially in the use of alter ego doctrines.").

identifiable federal policy or interest'." *Burks v. Lasker*, 441 U.S. at 479, 99 S.Ct. at 1838. In the last analysis, the trust interests of the Bast Group and Empire arise from federal policies which should not be defeated by deference to potentially varying, nonuniform *state* limitations on corporate liability and reliance on the sanctity and impenetrability of the state-created corporate form. *See Anderson v. Abbott*, 321 U.S. 349, 365, 64 S.Ct. 531, 539, 88 L.Ed. 793, 804 (1944).

## II.

■ In the case at bar, the Bast Group and Empire have not been able to cite any decisions within the Second Circuit which enunciate the federal common law doctrines allowing disregard of separate corporate entities. This Court does not believe it appropriate to adopt New York state law as the federal rule of decision when federal statutory trust rights are the subject matter of controversy. Although the Bank's contention is true that Congress did not expressly preempt state corporation law in the operation of the statutory trust under the P & S Act, the Court is mindful that "silence ... in federal legislation is no reason for limiting the reach of federal law ... To the contrary, the inevitable incompleteness presented by all legislation means that interstitial federal lawmaking is a basic responsibility of the federal courts." *United States v. Little Lake Misere Land Company, Inc.*, 412 U.S. 580, at 593, 93 S.Ct. 2389, at 2397, 37 L.Ed.2d 187, 197 (1973). *See generally* Note, *Piercing the Corporate Law Veil: The Alter Ego Doctrine under Federal Common Law*, 95 Harv.L.Rev. 853, 857–858 (1982).

The case at bar deals with two corporations. When seeking the equitable remedy of merging ("piercing") separately incorporated entities, most factual patterns involve parent and wholly owned subsidiaries. It is this type of enterprise which creditors seek to merge into a single corporate entity by applying the "mere instrumentality" doctrine of general corporate law. In the case herein, the singular factual difference is that Mrs. Giruzzi is the 100% stockholder of the Orange corporation while neither the Debtor nor its principal owners, Franklin and John Giruzzi, hold any legally cognizable interest or investment in Orange. Yet, it is clear that Mrs. Giruzzi is only the *legal*, as distinguished from *equitable*, owner of Orange for she has never invested any sum of monies in that corporation. It is this Court's view of the evidence that the Debtor (1) which acquired and financed operating assets and structured financial systems without compensation, and (2) to whom Orange sold the majority of its overall slaughtering production was the equitable owner of Orange despite its lack of formal ownership of issued stock. *Cf., Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1366 n.13 (S.D.N.Y.1978) (court in a motion for summary judgment declines to find that under no set of circumstances could it be shown that a husband-defendant was an alter ego of a corporation simply because 100 percent of the corporate entity's stock was held in the name of the defendant's wife). Accordingly, the Court shall implement principles similar to the well recognized "mere instrumentality" rule by considering the Debtor and Orange to be in a parent-subsidiary relationship.

■ The Courts will reluctantly pierce the corporate veil due to a presumption of corporate regularity. *Establissement Tomis v. Shearson Hayden Stone, Inc.*, supra at 1365; *see American Renaissance Lines, Inc. v. Saxis Steamship Co.*, 502 F.2d 674, 677 (2d Cir. 1974); *Matter of Typhoon Industries, Inc.*, 6 B.R. 886, 890 (Bkrtcy.E.D.N.Y. 1980). The corporate form may be disregarded only where equity requires the action to assist a third party. *See Crabtree Investments, Inc. v. Aztec Enterprises, Inc.*, 479 F.Supp. 448, 451 (M.D.La.1979). The application of the "mere instrumentality" rule requires a determination that the first corporate entity which is ignored was neither independent nor economically viable vis-a-vis claims of that corporation's third party creditors. Efforts to disregard separate corporate entities under equitable doctrines, *e.g.*, "mere instrumentality rule" and

"alter ego", are frequently interposed in bankruptcy proceedings.[6] No precise formula is available to predict when a court should disregard the corporate entity in that each case is *sui generis*. *See Brunswick Corporation v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), *aff'd*, 599 F.2d 34 (2d Cir. 1979). Yet, it is clear that the burden of proof by a preponderance rests with the parties seeking to disregard a formally incorporated entity. *See, id.; see also, Establissement Tomis v. Shearson Hayden Stone, Inc., supra* at 1365.

The statutory trust under § 206(b) of the P & S Act, 7 U.S.C. § 196(b) (1976) embodies a policy decision by Congress to supercede entirely legitimate state law collateralized financing arrangements in which meat packers are involved. The trust's operative effect frees livestock sellers from the customer-solvency vicissitudes which characterize the normal commercial flow of commerce. The bottomline result is that the sellers are guaranteed that the solvency of the packers with whom they deal is not to be the measure of their ability to recover for the value of the cattle livestock delivered. How far up the line of commerce this protection is to operate is not delineated by Congress other than in transactions between the livestock "sellers" and the purchasing "packers".

█ Therefore, if an insolvent corporate form is utilized in the seller-packer transaction, it is a clear abuse. To determine if another "parent" corporation can be found to have *abused the corporate form* and consequentially circumvented the operation of the P & S Act's statutory trust, the Court shall consider two facets of a subsidiary's operation. The question of abuse will be evidenced by (1) an inadequately capitalized entity which was (2) under the totally pervasive control of the parent corporation which is recipient of the subsidiary packer's statutory res. The Bank has repeatedly asserted that this Court take into considera-

tion that the Bast Group and Empire freely dealt with the Orange entity without ever expecting that the Debtor would subsidize any Orange defaults of payment. Query: Can knowledgeable sellers of livestock deal with an insolvent corporate packer at no risk to their statutory trust interests?

█ If one were to apply New York law, the creditor's knowledge of a corporation's solvency is a substantial element to be considered in obtaining the equitable remedial relief of piercing the corporate veil. *See Brunswick Corporation v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979), *aff'g*, 459 F.Supp. 1222 (E.D.N.Y.1978). *See generally* Barber, *Piercing the Corporate Veil*, 17 Willamette L.Rev. 371, 383–386 (1981). In light of Congress' policy to provide full protection to cattle sellers *regardless* of possible contrary and conflicting state law security agreement priorities, it would not further such a congressional policy to add a "knowledge of solvency" component to the aforesaid test for disregard of the corporate form under the P & S Act.

### Capitalization

The totality of the circumstances put into evidence leads this Court to conclude that Orange was grossly undercapitalized. There is no clear and direct evidence as to what amount of "risk" investment equity was in the Orange corporation. Apparently, there were no balance sheet statements for Orange. If the Court were to accept inferentially that skin and hides customers had given $50,000.00 as the initial capital, it is clear such monies were *quid pro quo* contributions for future items rather than risk equity-capital contributions. More importantly, the standard for adequate capitalization cannot be made *in vacuo*. The standard should be measured by the nature and magnitude of that entity's operative needs for working capital. *See Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 538,

---

**6.** *See, e.g., In re Palmer Trading, Inc.*, 15 B.R. 276 (N.D.Ill.1981); *Butler v. Collins*, 14 B.R. 546 (E.D.La.1981); *In re Pearl-Wick Corporation*, 15 B.R. 143 (Bkrtcy.E.D.N.Y.1981); *In re 1438 Meridian Place, N. W., Inc.*, 15 B.R. 89, 8 BCD 463 (Bkrtcy.D.C.1981); *Matter of Flanzbaum*, 10 B.R. 420 (Bkrtcy.S.D.Fla.1981); *Matter of Typhoon Industries, Inc.*, 6 B.R. 886 (Bkrtcy. E.D.N.Y.1980); *Matter of Twin Lakes Village, Inc.*, 2 B.R. 532 (Bkrtcy.D.Nev.1980).

88 L.Ed. 793, 802 (1944); *Eagle Transport Ltd., Inc. v. O'Conner,* 470 F.Supp. 731, 733 (S.D.N.Y.1979). The evidence clearly demonstrates that $50,000.00 is not even enough money to make a daily purchase of cattle for slaughtering according to Orange's operations. (*See* Findings of Fact ¶ 29). Apparently, there never was a working capital loan arrangement with any bank. Rather, the scenario is that the Debtor would daily advance funds by wire transfers to Key Bank to cover payment of the very substantial and constant issuance of Orange checks which met daily nonsufficient fund balances at Orange's Key Bank. (*See* Findings of Fact ¶ 17).

### Control

From Orange's incorporation, there is little doubt that the Debtor, through its president Franklin Giruzzi, controlled it. There is no evidence that anyone but Franklin Giruzzi managed, supervised, and rendered the ultimate business judgments for Orange. More importantly, this control was exercised to a degree I find to be equivalent to domination.[7] The record is devoid of any possible source of restraint on the Debtor's ability to acquire from Orange the specific beef carcass type and at the purchase price it so desired. The transactional relationship between the Debtor and Orange cannot be said to have been at "arms-length". This Court cannot ignore such facts as (1) the less than objective setting of Orange prices by an officer of the Debtor; (2) ignoring of potential loss to Orange in favor of overall net benefit and profit to the Debtor; and that (3) the Debtor was the exclusive customer of Orange's predominant sales item—slaughtered beef. (See Findings of Fact ¶ 14, ¶ 30, ¶ 31). But for formal establishment of Mrs. Angela Giruzzi as sole owner and director of Orange, there is a total absence of her exercising any control over Orange. There is no evidence of the simple maintenance of corporate formalities which

are earmarks of an independently operated, profit oriented corporation, *e.g.*, any salaries or dividends to corporate directors or owners, respectively; diligent collection of accounts receivable; any corporate minutes indicating independent action in the interests of the corporation; and maintenance of asset-liability balance sheet statements. Furthermore, as sole officer and director of Orange, Mrs. Giruzzi's singular corporate act of affixing her signature to checks and agreements constituted a manipulation by Franklin Giruzzi of the Debtor. (*See* Findings of Fact ¶ 12, ¶ 33).

### Single Controlled Enterprise

It is clear that the Debtor attempted to do corporate business in the form of vertical integration of its packing operations. It eliminated the need for a slaughtering carcass supplier by creating a nonviable corporate entity, Orange. The acquisition of beef carcasses through the Orange entity without providing it any sufficient basis of financial responsibility to meet the prospective liabilities of the livestock cattle sellers is *an abuse* of the separate corporate form. The interposing of Orange as the cash purchaser of the livestock created a further delay and evasion of the prompt payment provisions of the P & S Act. "It has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement." *Anderson v. Abbott, supra,* 321 U.S. at 362–63, 64 S.Ct. at 538 (Citations omitted). Moreover, the Debtor clearly benefited from such an entity acting as the conduit by which the Debtor acquired its primarily needed supplies—slaughtered beef carcasses. Lastly, the evidence tends to bear out that the result of the Debtor's non-armslength transactions (*see* Findings of Fact ¶ 34, ¶ 35) remain the principal obligations owing by any customer of Orange.

---

**7.** *See Fisser v. International Bank,* 282 F.2d 231, 238 (2d Cir. 1960); *C M Corporation v. Oberer Development Company,* 631 F.2d 536, 539 (7th Cir. 1980); *Coastal States Trading, Inc. v. Zenith Navigation S. A.,* 446 F.Supp. 330, 336–37 (S.D.N.Y.1977).

The Bank's defense of separate corporate entities rests on facts[8] which truly manifest an argument begging for observance of "form over substance" *i.e.*, ignoring the nonformal realities of the relationship between these two corporations. In the case of *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Company*, 540 F.2d 681 (4th Cir. 1976) it was succinctly stated: "[I]n applying the 'instrumentality' or 'alter ego' doctrine, the courts are concerned with reality and not form, with *how the corporation operated* and the . . . defendant's relationship to that operation." 540 F.2d at 685 (Emphasis added); *see Bulova Watch Company, Inc. v. K. Hattori & Co., Ltd.*, 508 F.Supp. 1322, 1340 (E.D.N.Y.1981). The P & S Act's statutory trust is a congressional device evidencing strong policy considerations in favor of cattle livestock sellers vis-a-vis all other creditors of meat packers.

The operational distinction between Orange as a slaughterer and the Debtor as a meat processing company is a mere fragmentation of today's predominantly integrated consumer meat processing industry. *See* S.Rep.No. 932, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.Code Cong. & Ad. News 2270. In the case at bar, such planned corporate fragmentation should not defeat the strong protective policy of the P & S Act. *Cf., Bowater Steamship Company v. Patterson*, 303 F.2d 369, 373 (2d Cir. 1962) (strong congressional policy of Norris-La-Guardia Act not meant to be defeated by the fragmentation of an integrated business into a congeries of corporate entities).

### III.

Presuming that the Court merges the Debtor and Orange, the Bank's second argument attempts to invalidate the trust interests of the Bast Group and Empire

which rest upon § 206(b) of the P & S Act, 7 U.S.C. § 196(b). That provision requires that the sellers-beneficiaries of the trust make *cash* sales of livestock to the packer-statutory trustee in order to be entitled to protection of the trust. The Bank seeks to demonstrate that *credit* sales were made by a showing of (1) a 'course of dealing' and (2) written notations on invoices, allegedly being extensions of credit to Orange by the Bast Group and Empire, respectively. Neither argument is novel, and in fact, each already has been rejected by other bankruptcy and district courts in other P & S trust litigation.

■ Pertaining to the Bast Group, the Stipulation's Exhibit "C" demonstrates that between the date of purchase of livestock and the date of receipt of a check in payment thereof an elapsed period of time often exceeded the prompt payment provision in § 409(a) of the P & S Act, 7 U.S.C. § 228b(a). Basically, the Bank's argument is that any livestock seller's voluntary acquiescence of late check payments indicates an extension of credit to Orange. A livestock seller's acceptance of slow payments over a period of time does not amount to an express extension of credit within the § 409(b)'s (7 U.S.C. § 228b(b)) statutory meaning. *In re R & D Investments, Inc.*, Case No. 80 0023, slip op. 7–8 (M.D.Pa. March 26, 1980); *see Fillippo v. S. Bonaccurso & Sons, Inc.*, supra at 1019–20; *Hedrick v. S. Bonaccurso & Sons, Inc.*, supra at 1032. This Court agrees and adopts the aforesaid authority. Accordingly, the Court must reject the Bank's 'course of dealing' evidence in its defense argument that the Bast Group-Orange transactions were credit sales of livestock.

---

**8.** As supported by the record, the Bank relies on numerous evidentiary facts to sustain its position that Orange and the Debtor were not a single corporate entity. The two corporations, Orange and the Debtor, were shown to have (1) shared no common officers or directors; (2) had neither common shareholders nor a formal parent-subsidiary relationship (3) had separate and distinct principal places of business; (4) kept separate financial and accounting records;

(5) projected separate corporate identities as a slaughterer and a wholesale boneless meat processor company, respectively; (6) had separate attorneys, and separate consulting contracts with a common firm; (7) were each separately incorporated pursuant to the New York Business Corporation Law; and (8) ostensibly, according to invoicing, engaged in business with one another in a commercial, arms-length fashion. Bank's Post-Trial Brief at 8–9.

Pertaining to transactions between Empire and Orange, the Bank focuses on Defendant's exhibits V–2 through BB–2 in its argument that there were express written extensions of credit by Empire to Orange. (*See* Findings of Fact ¶ 23). The Bank's reliance on the "chg" and "Charge" invoice notations as written waivers of the Empire's statutory interests disregards compliance with the required elements under the regulations governing the P & S Act's trust provisions.[9] A writing that does not conform to the regulations of 9 C.F.R. § 201.200 does not waive the trust provisions. *In re Gotham Provision Company, Inc.*, Case No. 79–247–BK–JAG–W slip op. at 3 (S.D. Fla. July 30, 1980), *aff'g*, 1 B.R. 255 (Bkrtcy. S.D.Fla.1979); *see Hedrick v. S. Bonaccurso & Sons, Inc., supra* at 1032. Although the Court has addressed the aforesaid arguments by the Bank, such arguments are also precluded by the binding effect of ¶ 39 and ¶ 40 of the parties' Stipulation of Facts. The clear and uncontradicted testimony of witnesses of the Bast Group, Empire and Franklin Giruzzi who supervised Orange's purchases, is that no type of oral or written express agreement extended credit to Orange. The explanatory meanings to "chg" and "Charge" by Empire's Mr. Nelson are accepted as true. (*See* Findings of Fact ¶ 23).

■ There is further and particularized dispute concerning a trust claim by Maplehurst Livestock Market, Inc. of the Bast Group. The Bank contends that Maplehurst's failure to make a "presentation" of the last payment check written for the incorrect sum of $41,254.00 invalidates its statutory trust claim. The Court rejects such a proposition. It is undisputed that the Maplehurst statutory trust claim notice was timely filed within the thirty (30) day period required by § 206(b) of the P & S

Act, 7 U.S.C. § 196(b) when a payment instrument has not been received. This notice's filing was sufficient because the Court considers that P & S Act's requirement for "prompt payment" implicitly requires that § 206(b)'s "*payment instrument*" sent be a *correct and prompt* payment instrument. Undeniably, the P & S Act is remedial legislation which is intended to be construed liberally with its purpose to prevent economic harm to unpaid cash sellers and consumers. *In re R & D Investments, Inc.*, BK–77–1225 & BK–77–1281, slip op. at 5–6 (Bankr.Ct.M.D.Pa. November 21, 1979), *aff'd*, Civil Action No. 80–0023 slip op. (M.D.Pa. March 26, 1980). There is no basis in the P & S Act nor its legislative history to conclude that *inexact* payment (which inevitably adds a burden to the livestock sellers operations) is considered to be in compliance with Congress' policy to provide sellers the full amount of the purchase price within twenty-four (24) hours of the finalized transaction. *See* P & S Act §§ 206(a), 409(a), 7 U.S.C. §§ 196(a), 228b(a) (1976). There is no basis for the Court to consider any of the livestock transactions between Orange and the Bast Group and Empire as credit sales.

### IV.

The Court finds that the Bast Group and Empire are entitled to the sums of $254,956.44 and $368,720.30, respectively, as their statutory trust claims. Additionally, they are entitled to prejudgment interest at the legally permissible rate. *See Pennsylvania Agricultural Cooperative Marketing Association v. Ezra Martin Company*, 495 F.Supp. 565, 570 (M.D.Pa.1980); *see also Marshall v. Burger King Corporation*, 509 F.Supp. 353, 355–56 (E.D.N.Y.1981) (federal courts authorized to award prejudgment interest in

---

9. The governing regulation is 9 C.F.R. 201.200. Before any credit purchase of livestock by a packer with annual purchases exceeding $500,000., the regulation requires that the packer obtains from the seller a written acknowledgement in a format with specific contents expressly narrating that the seller (1) acknowledges the written agreement for the sale of livestock on credit; (2) understands that he will

have no rights under the Packers and Stockyards Act trust provisions concerning any credit sales; (3) provides the agreement will remain in effect until cancelled in writing. The regulation further provides that the packer is to retain such agreement with a copy sent to the seller. *See* 9 C.F.R. § 201.200(a) (rev. ed. 1/01/81).

appropriate cases as part of their equitable powers). The prejudgment and postjudgment interest will be measured from one day following the "date of purchase" (also being the date of transfer of possession) in each particular sales transaction delineated in the Court's Findings of Fact ¶ 19 and ¶ 21 until the date of formal satisfaction and general release for both purchase price and all awarded interest. The rate of interest will be six percent (6%) per annum from the first day after the date of purchase until June 25, 1981, and will be nine percent (9%) per annum until the aforesaid date of formal satisfaction and general release. *See* 28 U.S.C. § 1961 and N.Y.Civ.Prac. Law, § 5004 (Supp. McKinney 1982); 1981 N.Y.Laws, c. 258, § 2.

Considering that all of the Debtor's accounts receivable do not originate from "native" beef sales of Bast Group and Empire (*See* Findings of Fact ¶ 2), it will only be proper to find that 86.5% (.9 of 95% of the Debtor's total accounts receivable revenue) are subject to the statutory trust claims impressed on the Debtor's estate. The Court is troubled by evidence in these proceedings which reveals that there exist non-parties who hold ostensible statutory trust notices with the Packers and Stockyards Administration. (*See* P–1 Ex. 9). A reading of filed trust notices designated Nos. 2, 7, 9, and 14 by the Administration narrates that Arthur Brown, Joseph D. Giruzzi, Johnstown Livestock Sales, Inc., and Joseph A. Rocco, are entitled to the purchase prices of $31,629.02, $5,867.49, $31,588.67 and $833.56, respectively. Accordingly, the estate of the Debtor shall retain the total sum of $69,918.74 plus that sum's pro rata accrued interest received by the Trustee since the creation of the estate before the Trustee distributes any "native" beef accounts receivable proceeds to the individual Bast Group claimants and Empire.

The Bast Group and Empire have adequately proven that they hold valid and duly preserved statutory trust claims under the P & S Act. Their effort has been to reach beyond the accounts receivable of Or-

ange into the Debtor's bankruptcy estate by merging the two separately incorporated entities through equitable relief. The Court grants such relief. Yet, the Bast Group and Empire do seek, if necessary, to impose their trust claims beyond the Debtor's estate. To the extent that the estate cannot fund the full amount of the Bast Group and Empire's respective trust claims and prejudgment interest, they ask this Court to order the Bank to return the necessary deficiency from pre-petition collections of the Debtor's accounts receivable. This relief must also be granted. The mere mechanical act of collection and application of the Debtor's accounts receivable to an outstanding loan owing from the Debtor does not remove the statutory trust "res" identity of those funds. *See In re Gotham Provision Company, Inc., supra* 1 B.R. at 261.

## CONCLUSIONS OF LAW

In accordance with the aforesaid findings of fact and principles of law, the Court makes its conclusions of law that the principal allegations of the complaint must be sustained; that the Plaintiffs Bast Group and Empire are cash sellers of livestock within the meaning of the P & S Act; that Orange was the instrumentality of the Debtor and that together they constitute a single integrated entity for the purpose of the P & S Act; that all accounts receivable from the sale of livestock, or derived meat, or meat products by the Debtor, from December 21, 1979 are a part of the P & S Act's statutory trust; that Orange and the Debtor were each engaged in the business of buying livestock and slaughtering same and each was "a packer" within the meaning of the P & S Act; it is therefore,

ORDERED that the assets of Orange constituting its accounts receivable are subject to the statutory trust of the Packers & Stockyards Act, and it is further

ORDERED that the Trustee of the Debtor's estate prepare an accounting of all the estate's accounts receivable attributable to the sale by Debtor of meat and meat food products, and it is further

ORDERED that such proceeds of the Debtor's accounts receivable are to be deemed trust property of the plaintiffs, not property of the Debtor's estate, to the extent of 86.5% of said accounts, and the plaintiffs may have judgment therefor, and it is further

ORDERED that the Packers & Stockyards Act statutory trust plaintiffs are entitled to prejudgment and post-judgment interest on the unpaid purchase price at the rate of 6% per annum from one day following the date of the unpaid purchase up to June 25, 1981 and 9% per annum thereafter, and it is further

· ORDERED that the Trustee is to apportion from any and all interest earned by the Debtor's estate a sum sufficient to pay the awarded interest on the accounts receivable of the Debtor constituting the statutory trust, and it is further

ORDERED that to the extent that the Debtor estate's portion of liquidated accounts receivable is not sufficient to meet the statutory trust claims of $254,956.44 and $368,720.30 of the Bast Group and Empire, respectively, the Bank is to pay to the plaintiffs, in their respective shares from its collection of Debtor's accounts receivable the remaining deficiency of the Bast Group and Empire claims not met by the Debtor-estate's contribution thereto, plus awarded interest, and the plaintiffs may have judgment therefor; and it is further

ORDERED that the pool from which said payments may be allocated is to be constituted by the total of all accounts receivable and proceeds thereof collected by the Bank from December 21, 1979, which are hereby found to total at least the sum of $582,219.86, together with the estate's contribution from accounts receivable, and it is further

ORDERED that the Debtor's Trustee is to retain $69,918.74 of the proceeds of the accounts receivable in his possession subject to the P & S statutory trust until the rights of non-party claimants are determined; and it is further

ORDERED that the Bast Group and Empire are also awarded statutory costs and disbursements but are denied attorneys' fees pertaining to these adversary proceedings.