In re G & L PACKING CO., INC., Debtor.

Lawson BAST d/b/a Bast's Livestock Exchange, et al., Plaintiffs-Appellees,

v.

ORANGE MEAT PACKING CO., INC.; and Stephen D. Gerling, as Trustee in Bankruptcy of G & L Packing Co., Inc., Defendants,

Marine Midland Bank, N.A., Defendant-Appellant.

EMPIRE LIVESTOCK MARKETING COOPERATIVE, INC., Plaintiff-Appellee,

v.

Stephen D. GERLING, as Trustee in Bankruptcy of G & L Packing Co., Inc.; and Orange Meat Packing Co., Inc., Defendants,

Marine Midland Bank, N.A., Defendant-Appellant.

Nos. 80–00208, 82–CV–689 and 82–CV–690.

United States District Court, N.D. New York.

July 17, 1984.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for defendant-appellant; Paul B. Zuydhoek, William J. Brown, Buffalo, N.Y., of counsel.

McPhillips, Fitzgerald, Mayer & McLenithan, Glen Falls, N.Y., for plaintiffs-appellees Lawson Bast d/b/a Bast's Livestock Exchange, et al.; James E. Cullum, Glens Falls, N.Y., of counsel.

Mazza, Williamson & Clune, Ithaca, N.Y., for plaintiff-appellee Empire Livestock Marketing Cooperative, Inc.; Robert I. Williamson, Ithaca, N.Y., of counsel.

Bersani & Marshall, Syracuse, N.Y., for Orange Meat Packing Co., Inc.; Keith Wolfe, Syracuse, N.Y., of counsel.

Stephen D. Gerling, Trustee, Utica, N.Y., for G & L Packing Co., Debtor.

Frederick J. Scullin, Jr., U.S. Atty., Syracuse, N.Y., Joanne Schwartz, U.S. Dept. of Agr., Washington, D.C., for the U.S. as amicus curiae.

## MEMORANDUM-DECISION AND ORDER

McCURN, District Judge.

Marine Midland Bank, N.A. ("Marine") appeals from an order of the United States Bankruptcy Court for the Northern District of New York (Leon J. Marketos, Bkrtcy. J.) awarding plaintiff-appellees Lawson Bast d/b/a Bast's Livestock Exchange, et al. ("the Bast Group") and Empire Livestock Marketing Cooperative, Inc. ("Empire") (collectively "Plaintiffs") $623,676.74 plus interest based upon a finding that plaintiffs were unpaid cash sellers of livestock within the meaning of Section 206 of the Packers and Stockyards Act, 1921, as amended, 7 U.S.C. § 181 *et seq.*, and that Orange Meat Packing Co., Inc. ("Orange") and G & L Packing Co., Inc. ("G & L") are a single integrated corporate entity for purposes of that section. The Court also directed that G & L's Trustee in Bankruptcy retain $69,918.74 of G & L's accounts receivable until the rights of certain nonparties are determined. *In re G & L Packing Co., Inc.*, 20 B.R. 789 (N.D.N.Y.1982). As set forth herein, this court agrees with the findings and conclusions of Bankruptcy Court in this complex matter, and affirms that decision in all respects.

### I.

On February 25, 1980, Marine and two other creditors filed an involuntary petition

in bankruptcy against G & L, a meat packing concern. The petitioners sought relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.,* which relief was granted by order of the Bankruptcy Court on May 24, 1980.

Shortly thereafter, a group of ten livestock sellers, referred to here collectively as the Bast Group, commenced an adversary proceeding against Stephen D. Gerling as Trustee in Bankruptcy of G & L; against Orange, a livestock slaughtering concern; and against Marine. In their amended complaint, filed April 28, 1980, the Bast Group alleged that they had made cash sales of livestock to Orange in the approximate aggregate amount of $254,956.43, that the amount remained unpaid, and that they have each complied with the notice and filing requirements for preserving their interest in the statutory trust provided by section 206 of the Packers and Stockyards Act. The Bast Group sought to recover the proceeds of the trust from G & L on the theory, *inter alia,* that Orange and G & L constitute a single integrated entity for purposes of the Packers and Stockyards Act trust provisions. Marine was named as a defendant on the ground that it had collected proceeds from G & L's sales, which proceeds were allegedly subject to the statutory trust.

On May 2, 1980, Empire commenced a similar adversary proceeding against the Trustee, Orange, and Marine. It alleged that it had made cash sales to Orange in the approximate aggregate amount of $368,721.30, that the amount remained unpaid, and that it had complied with the statutory notice and filing requirements. Empire's claims parallel those asserted by the Bast Group.

A joint trial for both actions was conducted by the Bankruptcy Court on September 23–25, 1981. Based on the evidence adduced at trial, including the parties' Stipulation of Facts, the Bankruptcy Court made 36 findings of fact. 20 B.R. at 793–800. Briefly, the court found as follows.

G & L is a New York corporation that was organized in 1955. Franklin B. Giruzzi was the President and 50% shareholder; his brother John Giruzzi was the Secretary/Treasurer and held the remaining 50% of the shares. G & L was a wholesale boneless meat company, a processor, and a purveyor of provisions. It would purchase beef carcasses from slaughterers, debone them, and sell those cuts of beef to stores, hotels, and restaurants. During the period of 1977–80, Franklin Giruzzi was in charge of the day-to-day operations of the business and made all the important business decisions.

G & L was financed, in part, by a line of credit extended to it by Marine. For collateral, G & L gave the bank a blanket security interest in its present and future inventories, accounts receivable, and contract rights; the bank perfected its security interest through timely filing.

In 1978–79, a period during which G & L and the industry as a whole suffered from a shortage of native beef, Franklin Giruzzi considered entering the slaughtering business to assure G & L's supply. After locating a defunct slaughtering concern in Dewitt, New York, Giruzzi sought financing. The Bankruptcy Court's findings read:

7. The Bank was the Debtor's primary lending institution for working capital-cash flow needs. The Bank had manifested its disinterest in financing a slaughtering concern. (I–T. 83–84, 154). Franklin Giruzzi originally wanted the Debtor to enter slaughtering operations as one corporation (I–T. 90), but he perceived that the Debtor, itself, could not expand to slaughtering without jeopardizing its financing relationship with the Bank. (I–T. 83–84, 88, 111–112, P–1 Ex. 2). Franklin Giruzzi directed Mr. Gross, the Debtor's management consultant, to meet with the Bank's Mr. Fowler who handled the Debtor's commercial finance account. (I–T. 92–93, 154).

8. In the Spring of 1979, Mr. Gross told Mr. Fowler that there would be no direct ownership by principals of the Debtor of the proposed slaughterer corporation. (I–T. 190, P–1 Ex. 2). Mr. Fowler ex-

pressed a concern as to the P & S Act's trust provisions being applied to the Debtor's operations. (I–T. 157, P–1 Ex. 2). The Debtor's dependence on the Bank's financing primarily motivated the establishment of a second, apparently non-associated corporation. (I–T. 90–91). Later, the attorneys for Orange also informed the Bank that (1) Angela Giruzzi would be Orange's sole shareholder, sole officer, and member of the Board of Directors, and (2) to their knowledge, "Franklin Giruzzi has no interest in said corporation or the business transacted by said corporation." (Def. Ex. M–2).

9. Despite the Bank's subsequently expressed concern about transactions between the Debtor and Orange which it knew to be companies interrelated through common family ownership (P–1 Ex. 1, 3), knowledge of the occurrences of such transactions and the failure to supply to the Bank certain requested assurances from the Packers and Stockyards Administration did not curtail the Bank's financing of the Debtor. (I–T. 163, 175, 204).

20 B.R. at 794–95.

Orange was incorporated on August 28, 1979. Mrs. Angela Giruzzi, wife of Franklin Giruzzi, was the President, sole director, and sole stockholder of the corporation. However, Mrs. Giruzzi testified that she was unfamiliar with such facts as her ownership interest in Orange, the identity of Orange's attorneys or accountants, her status as its only director, any director meetings, the minutes of the corporation, or the certificate of incorporation. She played no active role in the management or business of Orange, except to affix her signature at her home to corporate checks and certain other documents according to her husband's direction. Franklin Giruzzi held no formal corporate position with Orange, yet had "a pervasive control over the establishment and operations of Orange," 20 B.R. at 795, ¶ 14, and was present at the DeWitt plant every day. Among his other activities at Orange, Franklin Giruzzi "instruct[ed] Orange buyers of cattle what livestock and at what price *he* expected

them to purchase," *id.* at 796, ¶ 14, and "set ... the price for slaughtered livestock sold to [G & L] from Orange in such a way that profit to Orange was *not* an absolute goal so long as the overall *operation of Orange and [G & L]* produced a net profit." *Id.* (Emphasis in original).

Orange obtained the plant in Dewitt through an arrangement with Key Bank of Central New York, which held a mortgage on the premises. It also maintained a corporate checking account at Key Bank which was used to pay for its purchases. Orange's daily purchases of livestock involved sizeable amounts in demand instruments (checks). A standard procedure was devised to cover Orange's overdrafts on its checking account: A Key Bank representative would contact G & L's accountant, who would then arrange for Marine to wire the necessary funds to Key Bank.

G & L's records indicate that, as of December 5, 1979, 100% of its native beef supply came from Orange. Orange did send invoices to G & L with respect to these sales, and an expert witness produced by Marine opined that a valid vendor-customer relationship existed between the two corporations. The expert witness also testified that there was no apparent co-mingling of funds between the two corporations, but such testimony was qualified in that certain ordinary accounting records with respect to Orange were not produced, and indeed, may not have existed.

Between October 29, 1979 and January 8, 1980, Orange made purchases of livestock from the Plaintiffs, with respect to which an aggregate amount of $623,676.74 remains unpaid. The parties have stipulated as to the dates of the purchases, dates of payments, dates of check dishonors and other related information.

Between December 24, 1979 and February 25, 1980, Marine received, both directly and indirectly, payments from G & L's customers. Such payments, totalling $2,085,518.20, were applied by Marine to reduce G & L's accounts receivable line of credit balance.

Based on its findings of fact, which are only outlined above, and after a careful discussion of the legal issues raised by the action, the Bankruptcy Court concluded

> that the Plaintiffs Bast Group and Empire are cash sellers of livestock within the meaning of the P & S Act; that Orange was the instrumentality of the Debtor and that together they constitute a single integrated entity for the purpose of the P & S Act; that all accounts receivable from the sale of livestock, or derived meat, or meat products by the Debtor, from December 21, 1979 are a part of the P & S Act's statutory trust; that Orange and the Debtor were engaged in the business of buying livestock and slaughtering same and each was "a packer" within the meaning of the P & S Act ...

*Id.* at 809.

The Court therefore impressed the statutory trust upon Orange's accounts receivables and 86.5% of G & L's accounts receivables[1], and further ordered that to the extent that G & L's portion of liquidated accounts receivables is insufficient to meet the statutory trust claims of the Plaintiffs, Marine must pay the deficiency from its collection of G & L's accounts receivables. The court also awarded Plaintiffs pre-judgment and post-judgment interest. Finally, the court included a provision requiring G & L's Trustee to retain $69,918.74 of the proceeds of the accounts receivable in his possession subject to the statutory trust until the rights of non-party claimants are determined.

## II.

Section 206 of the amended Packers & Stockyards Act, 7 U.S.C. § 196, provides, in pertinent part:

> § 196. *Statutory trust established*
>
> ....
>
> (b) ... All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of livestock until full payment has been received by such unpaid sellers ....

This section, along with the other amendments to the Packers & Stockyards Act enacted in 1976, were devised to protect livestock sellers from potentially devastating financial losses of the type many such sellers experienced in the 1970's when a number of major meat packing concerns failed, leaving sellers unpaid. Under the law as it then existed, banks and other lending institutions were able to enforce their priority claims to the inventories and accounts receivables of the bankrupt packers, leaving the livestock sellers uncompensated for the products they had sold to the packers but for which they had not yet been paid. As the Senate Agriculture and Forestry Committee explained;

> Under present law, a packer is able to offer as a security for a loan the livestock, meat, meat food products, or receivables or proceeds therefrom, which he has not paid for. The producer, who was responsible for raising, feeding, and caring for the livestock is left unpaid, while secured creditors reap the reward of his labors ....

> What is needed to prevent future producer tragedies, as occurred following the APB [American Beef Packers] bankruptcy, is legislation that will afford a measure of protection to the livestock producer and feeder and yet not be so restrictive as to reduce competition in the livestock slaughtering business. H.R. 8410 accomplishes this dual objective.

S.Rep. No. 932, 94th Cong., 2d Sess. 5–6, *reprinted in* [1976] U.S.Code Cong. & Ad. News 2271, 2272. The statutory trust created by § 206(b) remedies this injustice by unequivocally giving priority to the interests of cash sellers of livestock in packer inventories, accounts receivable, and pro-

---

1. The percentage reflects the Bankruptcy Court's finding that not all of G & L's accounts receivables were attributable to sales of meat

products derived from livestock sold by the plaintiffs. *In re G & L Packing Co., Inc.,* 20 B.R. at 809.

ceeds derived from the cash seller's livestock over lenders who take security interests in those assets, subject to certain notice and filing requirements for the preservation of the trust. *In re Gotham Provision Co., Inc.,* 669 F.2d 1000, 1009 (5th Cir.1982).

The instant case is unique in that the livestock sellers have sought, and have obtained from the Bankruptcy Court, an order impressing the § 206 trust not only upon assets held by a purchasing packer, Orange, but also upon those held by a more remote purchaser of the beef carcasses, G & L, based upon its determination that Orange and G & L shared sufficient attributes to be considered a single integrated entity. Accordingly, the Bankruptcy Court held that the inventory and accounts receivable of G & L are subject to the statutory trust, thereby giving the livestock sellers priority over G & L's other creditors, notably Marine.

### III.

#### A.

Marine ascribes numerous errors to the Bankruptcy Court decision, with particular attention to the Court's determination to disregard the separate corporate existence of Orange and G & L for purposes of the Packers & Stockyards Act trust provision. Its first specific contention is that the Bankruptcy Court erred by failing to apply New York law in analyzing the nature of the corporate relationship between Orange and G & L. In so contending, Marine relies chiefly upon *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), wherein the Supreme Court held that the authority of disinterested directors to terminate shareholder derivative litigation is governed by applicable state law, provided that such law is consistent with the policies of the federal acts upon which the action is based. *See Abramowitz v. Posner,* 672 F.2d 1025 (2d Cir.1982). The Bankruptcy Court expressly rejected Marine's argument, explaining that *Burks* only clearly stood "for the principle of utilizing state law on corporate law issues pertaining to internal affairs of a corporation," 20 B.R. at 803, and did not prescribe "the rule of decision for litigants who attempt to enforce federal rights and interests by employment of the doctrine of 'piercing the corporate veil.'" *Id.* The Bankruptcy Court also observed that *Burks* itself instructed federal courts to be "ever vigilant to insure that the application of state law poses 'no significant threat to any identifiable federal policy or interest.'" *Id.* at 803–04, *quoting Burks,* 441 U.S. at 479, 99 S.Ct. at 1837. It then concluded that

> At the last analysis, the trust interests of the Bast Group and Empire arise from federal policies which should not be defeated by deference to potentially varying, nonuniform *state* limitations on corporate liability and reliance on the sanctity and impenetrability of the state-created corporate form.

*Id.* at 804.

■ While this Court does not read *Burks* quite as narrowly as the Bankruptcy Court apparently has, it nevertheless agrees with that Court's resolution of the intersystem choice-of-law question. *Burks* does review certain general principles for determining whether a court should adopt a state rule of decision with respect to issues that arise in federal question litigation, or whether the court should instead adopt the substantive rule that best serves the federal policy at stake. That choice will depend, generally, upon the nature of the body of law that is in issue, the federal policy or interest at stake, and the degree to which the state rule, or the lack of uniformity itself, is inconsistent with that federal policy or interest. With respect to the specific question before it, the *Burks* Court noted that corporations are creatures of state law; that federal law in that area "is largely regulatory and prohibitory in nature" and is generally "enacted against the background of existing state law," and that the state rule permitting disinterested corporate directors to discontinue shareholder derivative suits is not inconsistent with the federal policy or interest advanced by the Investment Company Act of 1940 or

the Investment Advisors Act of 1940. Thus, when read broadly, *Burks* and its progeny stand for the proposition that "there is no body of federal law of corporations" to be drawn upon whenever an incidental question of corporate law arises in federal question litigation. *See Federal Election Comm'n. v. National Right to Work Committee*, 459 U.S. 197, 204, 103 S.Ct. 552, 557–58, 74 L.Ed.2d 364 (1982) (state law provides "some guidance" in deciding whether declaratory judgment plaintiffs were "members" of a nonprofit corporation within the meaning of the Federal Election Campaign Act of 1971).

However, *Burks* does not mandate the blind application of state rules with respect to disregarding the corporate form in all federal question litigation. Rather, it instructs this court to analyze the *Burks* factors in this new context.

■ Looking first to the nature of the body of law that is in issue, it is basic that "[c]orporations are creatures of state law," *Burks*, 441 U.S. at 478, 99 S.Ct. at 1837, and that state law generally governs their affairs. However, a distinction must be made between state laws governing the internal affairs of corporations, and state laws defining the integrity of the corporate form itself. In the recently decided case *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) a Cuban bank contended that the law of Cuba should apply in determining whether it is an instrumentality of the government, and thereby entitled to invoke sovereign immunity, or whether it is an independent corporation, and thereby subject to the claims of an American Bank. The Supreme Court declined to apply Cuban law, explaining:

As a general matter, the law of the state of incorporation normally determines issue relating to the internal affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. See Restatement (Second) of Conflict of

Laws § 302, Comments a & e (1971). *Cf. Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975). Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue. See Restatement (Second) of Conflicts of Laws, supra § 301. To give conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts. We decline to permit such a result.

*Id.*, 103 S.Ct. at 2597. Although *Banco Para El Comercio* involved a choice of law question in the international rather than intersystem (state-federal) context, the principle articulated is applicable in either case. Indeed, in a footnote to the passage quoted above, the Court cited *Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944) for the analogous proposition that 'no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced." *Id.* at 2597 n. 10.

■ There is a substantial federal interest in supplying a federal rule of decision to the question of whether the trust provision of the Packers & Stockyards Act may be avoided by use of the corporate form. Unlike the federal legislation involved in *Burks*, which were "regulatory and prohibitory," the Packers & Stockyards Act is remedial in nature, and is to be construed liberally to protect unpaid suppliers of livestock from economic ruin. *See Pennsylvania Agricultural Cooperative Marketing Ass'n. v. Ezra Martin Co.*, 495 F.Supp. 565, 569 (M.D.Pa.1980). Moreover, as expressly stated in the statute itself, the trust "is intended to remedy such burden on and obstruction to commerce in livestock and protect the public interest." § 206(a), 7 U.S.C. § 196(a).

An obvious tension exists between the federal policy embodied in the Packers & Stockyards Act trust provision and the state law doctrines that uphold the corporate veil in all but the most egregious instances of fraud or abuse. Indeed, application of the various state rules of decision would encourage packers to regularly resort to the artifice of creating undercapitalized buffer corporations which, if valid under state corporate laws, would defeat the remedial policies that underlie the Packers & Stockyards Act trust. Thus the United States Department of Agriculture, appearing in this action as *amicus curaie*, warns that the application of state rules which are highly protective of separate corporate identities would enable packers "to circumvent and frustrate the federal policy evidenced by the federal statutory trust," and urges that such rules be displaced by a federal rule more consistent with the policy. As Department points out, a similar approach was taken by the District Court in *Fillipo v. S. Bonaccurso & Sons, Inc.,* 466 F.Supp. 1008, 1018 (E.D.Pa.1978) where the issue was whether state corporate law principles governed the extent to which the corporate device would shield an individual packer from obligations under the Packers & Stockyards Act trust. The court chose to apply a federal rule, explaining that

> the state law limitations on the alter ego doctrine are not necessarily controlling in determining the permitted scope of private suits brought by individuals to enforce rights under a superceding federal statute. Under *Bruhn's Freezer Meats* [*v. U.S.D.O.A.,* 438 F.2d 1332 (8th Cir. 1971)], and *Sebastopol Meat Company* [*v. Sect'y. of Agriculture,* 440 F.2d 983 (9th Cir.1971)], the Court finds that the corporate device cannot immunize individual defendants from liability once it is found they are "persons" and "packers under the Act."

*See also, Mattes v. United States,* 721 F.2d 1125, 1131–32 (7th Cir.1983) (U.S.D.A. may look through corporate entity in issuing suspension order for Packers & Stockyards Act violations.

A recent decision of the Supreme Court further supports the appropriateness of looking to federal statutory policy in determining whether to give effect to the separate identity of corporations under state law. *Copperweld Corporation v. Independence Tube Corporation,* — U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The issue in *Copperweld* was whether a parent corporation and its wholly owned subsidiary are capable of conspiring with each under § 1 of the Sherman Act. Prior to this decision, the Court had taken the position that coordinated economic activity between such entities could constitute a conspiracy in violation of the antitrust laws. A major rationale for the "intra-enterprise conspiracy doctrine" was that, because such entities

> availed themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities.

*Id.* at 2739–40, *quoting Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–86, 20 L.Ed.2d 982 (1968). In *Copperweld,* the Court rejected the intra-enterprise conspiracy doctrine, explaining that "substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." 104 S.Ct. at 2743 n. 21.

Although the *Copperweld* Court did not frame the problem before it as one of inter-system choice-of-law, it nevertheless engaged in an analysis not unlike that undertaken in *Burks,* and implicitly decided the choice of law question in favor of applying a federal rule of decision. That is, the Court considered the policy and purpose of § 1 of the Sherman Act, found that such policy would be disserved by treating corporations that are separate under state law as independent entities, and therefore rejected the application of state corporate law to this issue.

The instant case requires a similar result. The multifarious state law doctrines

of piercing the corporate veil, which are generally quite protective of the corporate form, are at odds with the legislative purpose of protecting livestock sellers and the public by means of the statutory trust under the Packers & Stockyards Act. As in *Copperweld,* a federal rule of decision is necessary to ensure that substance, not form, determines whether a separately incorporated entity is in fact the alter ego of a packer that is subject to the statute's trust obligations. In short, this court is persuaded that in this case it "should look to federal statutory policy rather than to state corporate law when deciding whether to pierce the corporate veil." Note, Piercing the Corporate Veil: The Alter Ego Doctrine under Federal Common Law." 95 Harv.L.Rev. 853 (1982).

### B.

Near the outset of its analysis, the Bankruptcy Court aptly noted that "[n]o precise formula is available to predict when a court should disregard the corporate entity in that each case is *sui generis.*" *In re G & L Packing Co., Inc.,* 20 B.R. at 805. Under the circumstances of this case, the Court indicated that its determination would depend upon proof of "(1) an inadequately capitalized entity which was (2) under the totally pervasive control of the parent corporation which is the recipient of the subsidiary packer's statutory res." *Id.* In Marine's view, "the Bankruptcy Court's attempt to fashion a rule is without foundation and is error as a matter of law." Brief at 34. This Court, however, finds the Bankruptcy Court's analytical approach well suited to the problem before it.

The respect to be accorded the corporate form depends upon the particular context in which it is challenged. As the Supreme Court recently explained in *Banco Para El Comercio, supra,*

> [o]ur cases have long recognized 'the broader principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice.' .... In particular, the Court has consistently refused to give effect to the

corporate form where it is interposed to defeat legislative policies.

—— U.S. ——, 103 S.Ct. at 2601. *See also,* Note: Piercing the Corporate Law Veil: The Alter Ego Doctrine under Federal Common Law, supra at 865 ("the court should determine whether the corporate veil should be pierced 'in the light of the policy underlying the applicable legal rule, whether of statute or common law.'").

■ The legislative policy underlying the Packers & Stockyards trust provision is to protect the public in general and livestock sellers in particular by "giv[ing] priority to the interests of cash sellers of livestock in packer inventories, accounts receivable, and proceeds derived from the cash seller's livestock over lenders who take security interests in these assets." *In Re Gotham Provision Co., Inc., supra,* 669 F.2d at 1009. That federal statutory policy would be defeated if the court were required to accept the independent corporate existence of "an inadequately capitalized entity which was ... under the totally pervasive control of the parent corporation which is the recipient of the subsidiary's statutory res." Such a scheme would simultaneously expose livestock sellers to a greater initial risk of nonpayment while undermining the protection of the statutory trust. Use of an undercapitalized corporate alter ego for purchasing livestock would, if tolerated, result in the injustice of the pre-enactment era, when "[t]he producer, who was responsible for raising, feeding, and caring for the livestock [was] left unpaid, while secured creditors reap[ed] the reward of his labors." S.Rep. No. 932, 94th Cong., 2d Sess. 5–6, U.S.Code Cong. & Admin.News, 1976 p. 2271. *Cf. J.P. Kennedy, Jr. v. Frosty Land Foods Int'l.,* No. 78–59–S (M.D.Ala. Mar. 27, 1979) (Packer's use of agent for purchasing livestock was a subterfuge to avoid P & S trust and would be disregarded). In sum, the factors considered by the Bankruptcy Court in determining whether to give effect to the separate corporate identities of Orange and G & L—i.e., the capitalization of Orange and the extent of control exercised by G & L—were appropriate, given the policies underlying the Packers & Stockyards Act.

## C.

■ In conducting this review, it is assumed that this court may consider the evidence *de novo*, and need give no deference to the findings of the Bankruptcy Judge.[2] After viewing the evidence independently, this court also finds that Orange was an undercapitalized instrumentality of G & L.

The record shows that Franklin Giruzzi, President and 50% owner of G & L, sought to operate a slaughtering packer in order to assure G & L of a supply of beef carcasses, and to eliminate the profits previously taken by slaughtering middlemen. An ostensibly separate corporate entity was created, as opposed to an expansion of the scope of G & L's operations, largely to alleviate Marine's concerns that G & L's assets could become subject to the Packers & Stockyards Act trust.

Although she put up no capital, Franklin Giruzzi's wife, Angelina, was made sole shareholder of Orange, as well as its president and sole director. She did not participate in the management of Orange except to sign checks and other documents when directed to do so by her husband. In reality, Franklin Giruzzi controlled and managed Orange.

Franklin Giruzzi's objective in operating Orange was not to build a profitable independent slaughtering firm, but rather to enhance the overall profitability of G & L and Orange as an integrated enterprise, in which G & L's interests predominated. For instance, pricing was formulated to keep Orange "viable" while saving expenses for G & L. *Transcript I* at 109.

Orange was grossly undercapitalized in relation to its large working capital needs, i.e., $500,000/year. Indeed, the record suggests that Orange was not capitalized *at all*. Its plant and equipment were furnished through an arrangement with Key Bank; funds for livestock purchases were made available at least in large part, from G & L's account at Marine.

**2.** Under Bankruptcy Rule 8013, in an appeal from the Bankruptcy Court, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."

However, Congress recently enacted the "Bankruptcy Amendments and Federal Judgeship Act of 1984," Public Law 98–353; 98 Stat. 333, which, *inter alia*, affects the standard of review. As amended by § 104(a) of the Act, 28 U.S.C. § 157(b)(1) authorizes Bankruptcy Courts to hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title. Presumably, the "clearly erroneous" standard of Rule 8013 would apply to such appeals.

However, 28 U.S.C. § 157(c)(1) then specifies that

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such a proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has specifically objected.

Although there is no case law or commentary yet available on these provisions in the new Act, it appears to this court that the instant proceeding is not a "core proceeding" but is "otherwise related to a case under title 11." The action to enforce statutory trust rights under the Packers & Stockyards Act is a civil proceeding that, in the absence of a petition in bankruptcy, could have been brought in a district court pursuant to 7 U.S.C. § 209. *See Hedrick v. S. Bonaccurso & Sons, Inc., supra,* 466 F.Supp. at 1030. It would thus have been a "related proceeding" within the meaning of this District's Emergency Resolution, paragraph (d)(3)(A). *See In re Turner,* 724 F.2d 338, 341 (2d Cir.1983). A "related proceeding" within the meaning of the Emergency Resolution seems to be the same functional category as a proceeding that is "not a core proceeding but that is otherwise related to a case under title 11."

With respect to the question of what proceedings are affected by the new Act, § 122(a) provides

Except as otherwise provided in this section, this title and the amendments made by this title shall take effect on the date of the enactment of this Act.

The exceptions appearing in subsections (b) and (c) do not implicate any statutory provisions involved in this appeal.

Accordingly, the court will review the findings of fact of the bankruptcy court in accordance with the de novo standard set forth in 28 U.S.C. § 157(c)(1).

Marine directs this court's attention to numerous formal indicia of the separate nature of Orange and G & L. It emphasizes that G & L and Orange are separately incorporated and share no common officers, directors or shareholders; that the firms are located in different cities and perform different commercial functions; that the two firms retained separate attorneys; that G & L had an accountant while Orange did not. These factors are not incompatable with a finding that G & L and Orange are a single integrated enterprise. Orange was set up specifically to expand G & L's operations into the slaughtering field; its location in Dewitt was due to the fortuitous availability of facilities there. The ownership and control of the two entities were separate in name only: Franklin Giruzzi was the dominant presence in the operation of both.

The weightiest evidence Marine can point to in support of its position is the testimony of its expert witness, an accountant, who viewed the available records of both corporations and opined that (1) there was no co-mingling of funds between them; and (2) there appeared to have been a vendor customer relationship between them. Although the witness' testimony must be discounted to some extent by the unavailability of certain standard accounting records with respect to Orange, it is clear that Orange regularly invoiced G & L for sales of beef carcasses, and that G & L maintained a record of amounts owed on account. Nevertheless, the witness was not privy to evidence of the centralization of decision-making between the corporations, or of their common equitable ownership.

■ Other bits and pieces can be found in the record that support the view that the entities were separate. In the final analysis, however, this court agrees with the Bankruptcy Court observation that Marine has advanced "an argument begging for observance of 'form over substance' i.e., ignoring the non-formal realities of the relationship between these two corporations." *In re G & L Packing Corp., Inc.*, 20 B.R. at 807. This court's review of the record as a whole leaves it with the firm impression that Orange and G & L were sufficiently related—with Orange functioning as an undercapitalized instrumentality of G & L—to warrant their treatment as a single integrated entity for purposes of the Packers & Stockyards Act trust.

## IV.

■ The trust created by Section 206 of the Packers & Stockyards Act is operative only for "livestock purchased by a packer in "cash sales ...'" 7 U.S.C. § 196(b). Section 206(c) defines a cash sale as follows:

> For the purpose of this section, a cash sale means a sale in which the seller does not *expressly extend credit* to the buyer. (Emphasis added)

Marine contends that the plaintiffs herein "expressly extended credit" to Orange through their course of conduct of acquiescing in receiving late payments for livestock purchases.

The Bankruptcy Court correctly rejected this argument. § 206 must be read in conjunction with § 409 of the Act, which requires prompt payment of livestock purchases unless the parties "expressly agree in writing" to waive such requirement. As the Court of Appeals for the Fifth Circuit has held:

> Read in this context, the language of § 206 defining "cash sales" to include all sales where the seller has not expressly extended credit contemplates that unless the parties clearly agree in writing to a credit arrangement, the transaction is a cash sale.

*In re Gotham Provision Co., Inc., supra,* 669 F.2d at 1005. *See also Fillipo v. S. Bonaccurso & Sons, Inc., supra* at 1019–20; *Hedrick v. S. Bonaccurso & Sons, Inc., supra* at 1032. The *Gotham* court also upheld the authority of the Secretary to prescribe a writing requirement for an express extension of credit under § 206. *Id.* at 1007 n. 7. *See* 9 C.F.R. § 201.200 (1981).

Since the transactions in question did not involve written extensions of credit, it was correct to treat them as "cash sales" within the meaning of the Act.

## V.

To preserve the benefit of the statutory trust, an unpaid cash seller must comply with the notice and filing requirements of section 206(b):

... the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 409, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

7 U.S.C. § 196(b). Marine contends that one seller, Maplehurst Livestock Market, Inc., failed to preserve its right under this section because it failed to make a presentation of a check for payment, and then file a timely notice of dishonor.

■ This Court again concurs with the Bankruptcy Court's rejection of Marine's argument. The evidence established that Maplehurst filed a notice of nonpayment within thirty days of the sale; it subsequently received a check written for an incorrect amount. Neither the language nor the policy of the Act would require a seller, under such circumstances, to present the late, incorrectly drawn check for payment, await dishonor, and file notice a second time.

## VI.

Marine next contends that it was error for the Bankruptcy Court to impress the statutory trust upon proceeds of G & L's livestock product sales that Marine had collected. In Marine's view, Congress did not intend to extend the § 206 "lien" down the chain of commerce to proceeds held by a good faith assignee of a processing, as opposed to slaughtering, packer.

■ Once again, this Court finds Marine's arguments unpersuasive, and up- holds the Bankruptcy Court's determination. Section 206(b) provides that:

All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock ...

An unpaid seller of livestock who seeks to recover the trust is not required to specifically trace or identify the inventories or proceeds attributable to his sale of livestock. As the Court of Appeals in *In re Gotham, supra,* explained:

The only burden on unpaid cash sellers in such case is to prove the balance due to them and the existence of a floating pool of commingled inventories of livestock products, accounts receivables and proceeds derived from cash and credit livestock sales.

669 F.2d at 1011. Proceeds from livestock sales which are collected by a packer's creditor and applied against the principal amount of the packer's debt are considered part of that "floating pool," and are subject to recovery by the livestock seller. *In re Gotham,* 1 B.R. 255, 261 (S.D.Fla.1979), *aff'd,* 669 F.2d 1000. Since the proof shows that Marine collected proceeds from G & L's sales of livestock products and applied those funds against G & L's line of credit balance, as in *Gotham,* "the bank must return to the [livestock sellers] from the payments on the accounts receivable which were applied to reduce the balance of the Bank's loan to [the debtor] the amount necessary to compensate the [livestock sellers] in full for their cash sales to [the debtor]." *Id.,* 669 F.2d at 1009–10. Moreover, this case is not distinguishable on the ground that G & L was not a slaughterer-purchaser; as determined above, Orange and G & L are to be treated as a single integrated enterprise for purposes of the statutory trust.

## VII.

■ Marine challenges the award of prejudgment interest by the Bankruptcy Court. There is ample precedent for such

award in this sort of lawsuit. *See e.g., In re Gotham, supra; PACMA v. Ezra Martin Co.*, 495 F.Supp. 565 (M.D.Pa.1980). The award was well within the bounds of the court's discretion and will not be disturbed here.

### VIII.

The Bankruptcy Court directed G & L's Trustee in Bankruptcy, Stephen Gerling, to hold in escrow the sum of $69,918.74 plus interest for four livestock sellers who filed § 206 notices with the Packers and Stockyards Administration, but did not join as co-plaintiffs in this action. Both Marine *and* the plaintiffs herein contend that this was error. Marine argues simply that the Court was without jurisdiction to issue such an order, and that by so doing it presupposed the validity of unadjudicated claims. The Bast Group emphasizes the unfairness of allowing nonparties that did not share in the expenses or hazards of this litigation to benefit from it. If recovery is allowed, the Bast Group asks that it be conditioned upon (1) prior full payment to the plaintiffs; and (2) pro-rata contribution toward plaintiff's litigation costs.

In its *amicus* brief, the Department of Agriculture argues in favor of the ruling, pointing out that the Bankruptcy Court did not determine the personal rights of any non-parties, or make any awards; it merely directed the trustee to hold, in an escrow account, monies purportedly subject to the trust in an amount adequate to provide full payment to all unpaid sellers. In the Department's view, the Bankruptcy Court was simply "reminding the trustee of this duties as fiduciary to preserve funds subject to the trust until all colorable claims are determined." Brief at 40.

 This Court will uphold the order. The Bankruptcy Court not only had jurisdiction over the controversy presented by the adversaries; it had jurisdiction "of all of the property, wherever located, of the debtor, as of the commencement of such case [under title 11]." 28 U.S.C. § 1471(e).[3]

This section "grants to the Bankruptcy Court the broadest possible jurisdiction over the property of the debtor." 1 Collier on Bankruptcy ¶ 3.01 at 3–56 (15th ed.). The order in question preserves property that was held by the debtor at the commencement of the case, pending determination of conflicting claims to that property. Viewed as a provisional remedy, issued in the context of a Chapter VII liquidation for the purpose of preserving the federal statutory trust rights of claimants who have filed statutory notices, the order is affirmed.

Accordingly, the Bankruptcy Court order is affirmed and adopted by the Court in all respects, and the appeal is dismissed.

IT IS SO ORDERED.

---

**3.** Under the "Bankruptcy Amendments and Federal Judgeship Act of 1984," *supra,* the same grant of *in rem* jurisdiction is conferred upon the district court, § 101(a), *amending* 28 U.S.C. § 1334(d).