937 F.2d 1110
 20 Fed.R.Serv.3d 236
 VAL-LAND FARMS, INC., a Wisconsin corporation,
Plaintiff-Appellant (89-5929), Cross-Appellee,
Adrian Gerszewski Potato Company, a North Dakota
corporation, on its own behalf and as assignee of the
rights, claims, and interests of Maxine's Potato Service,
Inc., a Minnesota corporation, Intervening
Plaintiff-Appellant (89-5929), Cross-Appellee,
Keith D. Parr, Esq.; John O. Threadgill, Esq.; Michael A.
Nolan, Esq., Attorneys-Appellants (89-6140), Cross-Appellees,
v.
THIRD NATIONAL BANK IN KNOXVILLE, a national banking
association, Defendant-Appellee, Cross-Appellant (89-6142).
 Nos. 89-5929, 89-6140 and 89-6142.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 14, 1990.
Decided July 2, 1991.
 
 John O. Threadgill, Butler, Vines, Babb & Threadgill, Knoxville, Tenn., Keith D. Parr (argued), Lord, Bissell & Brook, Chicago, Ill., for plaintiff-appellant and intervening plaintiff-appellant.
 Gregory G. Little (argued), John A. Lucas, Hunton & William, Knoxville, Tenn., for defendant-appellee.
 John O. Threadgill, Butler, Vines, Babb & Threadgill, Knoxville, Tenn., Keith D. Parr, Lord, Bissell & Brook, Chicago, Ill., Michael A. Nolan, Knoxville, Tenn., for attorneys-appellants cross-appellees.
 Before KEITH and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 The plaintiffs in this case are potato growers who sold potatoes to Compton Produce (a third party, not directly involved in this litigation) who went bankrupt. The plaintiffs sued Compton Produce and won a judgment. Alas, Compton Produce had no money. In discovery in that case, however, the plaintiffs found documents suggesting to them that they might have a cause of action against Compton Produce's banker, Third National. Consequently, the plaintiffs filed a two-count complaint against Third National. One count was a claim under the Perishable Agricultural Commodities Act ("PACA"), and the other was a state common law claim. Neither count made it to trial; the court granted a motion to dismiss on the PACA count and granted summary judgment on the state common law count. The plaintiffs appeal these rulings. After judgment had been entered, the court entertained a motion by Third National for Rule 11 sanctions. The court granted the motion as to the PACA claim but not as to the common law claims. The plaintiffs and their attorneys appeal, arguing that Rule 11 sanctions should not have been imposed at all, and the defendant has cross-appealed, arguing that sanctions should have been granted as to all counts and, in any event, that the amount of sanctions was too low. We affirm the decision of the court below on all issues.
 
 
 2
 * Val-Land Farms, Maxine's Potato Service, Inc., and Adrian Gerszewski Potato Co., Inc. are all potato farmers. Each agreed to sell its 1984 crop to Compton Produce. Compton Produce was a potato broker and was a corporation wholly owned by an individual named Minyard Compton. Compton Produce purchased potatoes from farmers, in advance, and then sold the potatoes to companies that processed the potatoes into potato chips. Compton Produce functioned, in other words, as a middleman. Starting in July 1984, the plaintiffs began digging potatoes and shipping them to Compton Produce. Unfortunately, Compton Produce suffered from financial difficulties that ultimately led to bankruptcy. The plaintiffs did receive some payments for the potatoes, but Compton Produce was, because of its financial difficulties, ultimately unable to pay for all of the potatoes it received from the plaintiffs. Although the plaintiffs managed to get a judgment against Compton Produce in a separate action, that judgment is valueless to the plaintiffs and other similarly situated potato growers.
 
 
 3
 The defendant in this case, Third National, provided banking services to Compton Produce. In 1982, Compton Produce borrowed $800,000 from Third National. By 1985, Compton Produce still owed over $700,000 to Third National. At the same time, Compton Produce also had two checking accounts at Third National, a "general checking account" and a "chip and seed account." Compton Produce wrote checks from the chip and seed account in order to pay for potatoes. Minyard Compton, the sole owner of Compton Produce, and his wife, Imogene Compton, were customers of Third National as well. The Comptons personally owed Third National about $400,000 on a variety of loans, the largest of which was the mortgage on their house.
 
 
 4
 During the course of 1984, Compton Produce's financial woes grew more acute. More and more frequently, Compton Produce wrote checks without having enough money in its accounts to cover the checks. At first, Third National had a very lenient attitude toward these problems. Third National covered the checks almost as a matter of course, and it did not charge interest or NSF charges on the checks. Though there are some factual disputes regarding the full extent of Compton Produce's problems, all agree that, by January 1985, the chip and seed account was almost constantly overdrawn.
 
 
 5
 In January 1985, Third National assigned Robert Wrather to the Compton Produce accounts.[1] Wrather quickly concluded that the Compton Produce account was in trouble and he took immediate steps to correct the problem. Third National began returning checks and charging NSF charges in January. In exchange for a loan to cover what it already owed the bank, Compton Produce signed a security agreement in a number of items, including Compton's produce inventory and accounts receivable. The agreement cross-collateralized all of the loans from Third National to Compton Produce and to Minyard and Imogene Compton, including the mortgage of the Comptons' home. At the time of this agreement, Compton Produce already owed about a million dollars to produce growers throughout the country in addition to what it owed to Third National. When Compton Produce did go out of business, Third National used its security interest to seize all of the covered assets, including the house owned by Minyard and Imogene Compton personally.[2] It then liquidated these assets and applied the proceeds against Compton Produce's outstanding unpaid debt.
 
 
 6
 This suit was initially filed against Third National by Val-Land Farms. Subsequently, with the consent of Third National, Gerszewski entered the fray, both on its own behalf and as the successor in interest to Maxine's. The complaint filed by the intervening parties is, for all intents and purposes, identical to the complaint filed by Val-Land Farms.
 
 
 7
 The plaintiffs' complaint contains two counts. Count One is a cryptic hodgepodge of claims and allegations that reads, at least at first glance, like a claim for common law fraud. In the second count, the plaintiffs claimed that, by loaning money to Compton Produce, the bank had been somehow transmogrified into a potato dealer. This, according to the plaintiffs, brought the bank within the ambit of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. Sec. 499a et seq. The case was originally assigned to Judge James Jarvis. Judge Jarvis granted a Rule 12(b) motion to dismiss on the PACA claim, but denied the motion to dismiss on Count I. The parties then agreed to have the case decided by a magistrate. Consequently, Magistrate Robert P. Murrian took over the case. After the completion of discovery, Magistrate Murrian granted summary judgment for Third National on the remaining claim. After judgment had been entered and the plaintiffs had already filed a notice of appeal, Third National moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure. The magistrate determined that he did have jurisdiction to entertain the motion and he granted the motion as to the PACA claim but denied it as to the common law claim set forth in Count I, however that claim might be characterized.
 
 II
 
 8
 In support of its "common law" claim, the plaintiffs now maintain that Third National created an "illusion of solvency" by honoring checks despite the fact that Compton Produce was not solvent. This allegedly resulted in subsequent sales to Compton Produce resulting from the fact that the plaintiffs were unaware of Compton Produce's financial condition. The magistrate granted summary judgment on this count.
 
 
 9
 The plaintiffs seem somewhat unclear on the concept of summary judgment. They seem to believe that the court can only look at the bare allegations of the complaint. They are also under the impression that, because it denied the defendant's motion to dismiss, the complaint was judged, once and for all, to be "legally sufficient." Thus, the plaintiffs seem to believe that the district court was bound to accept any legal arguments that the plaintiffs might present, however fanciful those arguments might be. The plaintiffs could not be more wrong. The Supreme Court has made it clear that bare allegations set forth in a complaint are not enough. Rule 56(e) of the Federal Rules of Civil Procedure states clearly that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading...." Moreover, under Rule 56(c), the court must determine whether "the moving party is entitled to judgment as a matter of law." The Supreme Court has explained that summary judgment is appropriate where a party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order to make this determination, the trial judge must make purely legal judgments that go to the nature and sufficiency of the complaint as well as the evidence put forward to support it. Inevitably, the court must determine what the elements of the case are before it makes a decision about whether there are material disputes on each element. In so doing, the court will inevitably address issues that might also be addressed in the context of a motion to dismiss on the pleadings. In any event, we are free to affirm summary judgment because the complaint is legally insufficient.
 
 
 10
 Our task in determining if there are facts creating a triable issue is hindered by the plaintiffs' refusal to specify the nature of their claim. When filed, the complaint only indicated that Count I was a "common law" claim. In ruling on the motion to dismiss, Judge Jarvis acted on the assumption that the plaintiffs had presented a common law fraud claim. In defending against the motion for summary judgment, however, the plaintiffs claimed that they were, and always had been, asserting a claim for equitable estoppel or for the imposition of a constructive trust. On appeal, the plaintiffs maintain that the "label" of the theory upon which they seek to recover is irrelevant. Following their view that the "label" attached to a theory of recovery is irrelevant, the plaintiffs try to pursue all of their theories. Just for good measure, in their reply brief, the plaintiffs state that their claims "could also be interpreted to include a claim of fraudulent conveyance."
 
 
 11
 The plaintiffs are, of course, free to pursue whatever colorable theories of recovery support their case. But they are not free to present a moving target, thereby making the courts (both us and the district court) as well as their opponent guess at the nature of the claim presented to the court. Despite its valiant efforts, Third National has been unable to pin the plaintiffs down on what theory or theories support recovery under these facts. This court will consider, in this appeal, whether the plaintiffs have come forward with enough evidence to present material issues on any of the three theories of recovery arguably raised below. We do not consider the fraudulent conveyance claim, as that claim was presented for the first time in a reply brief on appeal. This court does not consider contentions not properly raised below. Chandler v. Jones, 813 F.2d 773, 777 (6th Cir.1987).
 
 A. Fraud
 
 12
 In Tennessee, fraud requires the intentional or (in commercial situations) negligent misrepresentation of a material fact. See Holt v. American Progressive Life Insurance Co., 731 S.W.2d 923, 927 (Tenn.App.1987). Obviously, there must be representation of some sort before there can be a misrepresentation. Third National denies that it made any representations at all to the plaintiffs, and we must agree.
 
 
 13
 It is undisputed that nobody from Third National called any of the plaintiffs on the telephone and said that Compton Produce was solvent. Nor did the bank prepare a credit report that was somehow made available to the plaintiffs. Cf. Central States Stamping v. Terminal Equipment Co., 727 F.2d 1405 (6th Cir.1984). The plaintiffs point to one act--honoring checks--and maintain that this act constituted a representation regarding Compton Produce's financial status. Although behavior sometimes communicates a message, see, e.g., Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (flag burning constitutes "speech" protected by the first amendment), we are unconvinced by the plaintiffs' repeated and vigorous claims that honoring a check is such a message.
 
 
 14
 The theory behind the plaintiffs' position that honoring a check constitutes a message is elusive. At times, the plaintiffs seem to maintain that when a bank honors a check it sends a message that the account holder has enough money in the account to pay the check. Alternatively, they argue that honoring an overdraft check sends a message that the bank believes that the drawer is worthy of credit. The plaintiffs strongly emphasize the fact that Third National did not charge NSF charges or interest to Compton Produce when honoring the overdrawn checks, but where this fits in is not clear. They also assert that honoring a check is a "representation of solvency," but whether this representation arises out of the representation that the account holder has enough money in the account or that the account holder is worthy of an unsecured loan or constitutes still a third category of representation is not clear.
 
 
 15
 Third National maintains that honoring a check does not, as a matter of law, constitute a representation of any type. We believe that Third National's position is correct. The plaintiffs fail to distinguish between conduct that is intended to be expressive (as in flag burning) and conduct that might conceivably lead random third parties to make inferences of some sort. The plaintiffs seem to believe that because some observer might make certain inferences from observing the bank's conduct, that conduct must constitute a representation. Although we are aware of no authority directly addressing this issue, we see no reason, either logical or legal, to adopt the plaintiffs' position.
 
 
 16
 First, it is well settled that writing a check does not constitute a representation. Williams v. United States, 458 U.S. 279, 285, 102 S.Ct. 3088, 3092, 73 L.Ed.2d 767 (1982). If writing a check isn't a representation, then we are at a loss to see how honoring one would be one either. At first glance, writing a check would appear to communicate more of a message more than honoring one would. After all, the writer of a check fills out a dollar amount, indicates the name of the person to whom the check is addressed (or if it is being made out to bearer) and affixes his or her name to the check. A bank, by contrast, just sends money.
 
 
 17
 But the plaintiffs argue that sending money "sends a message"--either that the account has enough money in it or that the account holder is worthy of an unsecured loan. It is certainly true that a bank's action "sends a message" in some sense of the term. Yet, unlike the flag burning at issue in Johnson, we know of no case from any jurisdiction in which a party has been held liable for a misrepresentation--regardless of the legal theory employed--when that party failed to engage in any conduct intended as a communicative act. Nor have the plaintiffs directed our attention to any such cases. It seems clear that the purpose of the bank's act was not to communicate a message to the plaintiffs. Furthermore, if we were to adopt the plaintiffs' suggested rule, future creditors could hold Visa liable every time someone who held its credit card failed to pay his or her debts. The principle that a bank sends an open-ended message to the world about credit-worthiness whenever it pays a check despite insufficient funds in the account (an act clearly allowed by the U.C.C., by the way) or grants credit would have quite pernicious effects. Those most likely to need a break from their banks--the poor, struggling entrepreneurs, businesses undergoing cash-flow problems--would be less likely to get it because banks would fear the potentially unlimited liability that might arise should they cover a check or make a loan to a party in financial distress and thereby make a "representation of solvency" to an undefined class of third parties.
 
 
 18
 None of the cases cited by the plaintiffs leads us to the conclusion that, if given the chance, Tennessee would adopt such an apocalyptic result. The plaintiffs rely heavily on Payne Brothers v. Burnett, 269 S.W. 27 (Tenn.1925).[3] Despite some superficial resemblances to our case, the Payne Bros. case is readily distinguishable. The plaintiffs read Payne Bros. to stand for the proposition that whenever a bank covers overdrafts it has an obligation to do so ad infinitum. Their reading of this case is far too broad. In Payne Bros., the Payne Brothers sued T.C. Burnett, a produce dealer, and his bank, the Mossy Creek Bank, a banking institution located in Jefferson City Tennessee. In that case, Burnett, who would be analogous to Compton Produce, had an account that was almost constantly overdrawn. The court held the Mossy Creek Bank liable to Payne Bros. for some poultry purchased with two checks written on the account. What distinguishes that case from our case, however, is the fact that an agent of the bank specifically told Burnett that the bank would "take care of" the checks. Id. at 29. Such an express undertaking is conspicuously absent from our case.
 
 
 19
 In order to bolster their position, the plaintiffs rely heavily on the fact that the bank was paying overdrafts without charging interest or NSF charges. While interesting, this fact is quite irrelevant to the issue of whether the bank made a representation to the plaintiffs. In fact, the plaintiffs only became aware of the financial arrangements well after the events had already taken place. Accordingly the fact that the plaintiffs were kept in the dark, a fact that they emphasize at every opportunity, undermines rather than supports their position.
 
 
 20
 In any event, even if the plaintiffs had known that credit was being advanced by the bank, it would only tell them that the bank had decided to extend credit. It would not tell the plaintiffs anything about whether additional credit was warranted. Accordingly, the plaintiffs have not come forward with sufficient evidence to create a triable issue on the fraud count.
 
 B. Equitable Estoppel
 
 21
 The plaintiffs also argue that the bank is equitably estopped from denying the validity of the claim. Unfortunately for the plaintiffs, however, equitable estoppel does not create a cause of action under Tennessee law. See Franklin v. St. Paul Fire and Marine Insurance Co., 534 S.W.2d 661, 666 (Tenn.App.1976).C. Constructive Trust
 
 
 22
 The plaintiffs also maintain that the bank held the money in the "chip and seed account" in trust. This trust resulted, according to the plaintiffs, from the fact that the bank knew that the funds in the chip and seed account were intended for the benefit of the plaintiffs. Tennessee law recognizes both resulting and constructive trusts. Resulting trusts arise out of the presumed intent of the parties, while constructive trusts are constructed by a court of equity to satisfy the demands of justice. See Browder v. Hite, 602 S.W.2d 489, 492 (Tenn.App.1980). The plaintiffs have utterly failed to demonstrate that either a resulting or constructive trust existed in this case on these facts. Moreover, even if the bank held the account in trust for the plaintiffs it would not help the plaintiffs. The undisputed evidence clearly indicates that the value of the Compton Produce accounts was, at the time the accounts were closed, negative. There was simply nothing for the bank to hold in trust. There is no evidence that the bank set off or appropriated any of the funds from the account. Third National secured some loans and collected on the security interest. But the money received by Third National was never a part of the account. The plaintiffs also claim that Third National acted wrongly by waiting until Compton Produce received a particular payment before closing out the account. So what if it did? By accepting the money for payment into the account, Third National increased the value of that account. We fail to see how a trustee violates any obligation by accepting a payment into the fund held in trust.
 
 III
 
 23
 The plaintiffs also maintain that the defendant Third National Bank violated provisions of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. Sec. 499a et seq. The district court dismissed this claim on the pleadings. Thus, we take all of the facts in the complaint as true for purposes of review. The threshold question for review is whether the Third National Bank was a potato dealer under PACA. We hold that it was not, and affirm the district court's decision.
 
 
 24
 The only action taken by Third National was loaning Compton Produce money and funding overdrafts without charging NSF charges or interest, a practice that essentially amounts to giving Compton Produce an interest-free loan. The plaintiffs maintain that this somehow makes the bank a potato dealer. They argue that, as Compton Produce had no money, the bank was really the purchaser of the potatoes. Thus, according to the plaintiffs, "economic reality" transforms the bank into a potato dealer.
 
 
 25
 PACA defines a dealer as "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce...." There is, in this case, no evidence that the defendant Third National bank ever purchased a single potato, much less purchased potatoes in wholesale or jobbing quantities. The only argument that the plaintiffs make is their "economic reality" argument. The plaintiffs cite In re G & L Packing Company, 41 B.R. 903 (N.D.N.Y.1984) in support of their position. This case is wholly inapposite. In G & L Packing, the court held that two companies--Orange Meat Packing Co., Inc. and G & L Packing Co., Inc.--constituted a single integrated entity for purposes of the Packers and Stockyards Act. Id. at 905. The evidence in that case demonstrated that Orange constituted an "undercapitalized instrumentality" of G & L. Id. at 913. The court found that Orange had been formed for the sole purpose of supplying beef carcasses to G & L at terms favorable to G & L. Ibid. The parties never intended for Orange to be a profitable enterprise, so the terms of the exchanges were skewed in favor of G & L.
 
 
 26
 The plaintiffs argue that this case is analogous, with Third National playing the role of G & L and Compton Produce the role of Orange. There is a slight superficial resemblance to G & L Packing, at least inasmuch as Third National supplied much of the capital for Compton Produce. But the differences are more important. Even given the most liberal reading, however, the plaintiffs' complaint would not give rise to a PACA action, even if we were to adopt the reasoning of G & L Packing. The plaintiffs do not allege that Third National was the invisible hand behind Compton Produce, or that it was formed only for the benefit of Third National. Indeed, if Compton Produce had become more profitable than was necessary to repay the loans, Compton Produce, not Third National, would have kept the profits. Moreover, Third National wanted a thriving customer, not a bankrupt husk. Nor do the plaintiffs allege any common ownership or management that might give rise to the inference that the discrete incorporation was pretextual. Cf. id. at 914. It is certainly true that Third National wanted Compton Produce to repay its loans, with interest. There is nothing sinister about that fact, though. Loaning money to persons or entities covered by various regulatory schemes does not automatically subject a bank to all of the various requirements of those schemes, including registration with the pertinent regulatory agency.
 
 IV
 
 27
 After the defendant prevailed on both counts, it asked the magistrate to award Rule 11 sanctions on both counts. The magistrate awarded sanctions on the PACA count, but he declined to do so on the second "common law" count. The plaintiffs appeal the award of sanctions itself and the defendant appeals, arguing that the magistrate should have awarded sanctions on both counts. The plaintiffs' first argument is jurisdictional. They claim that the magistrate lacked jurisdiction, as they had already filed a notice of appeal. Our circuit has held that a district court retains jurisdiction to entertain a motion for Rule 11 sanctions even after the filing of a notice of appeal. Regional Refuse Systems v. Inland Reclamation Company, 842 F.2d 150, 156 (6th Cir.1988).
 
 
 28
 We review a decision to grant Rule 11 sanctions to determine if the district court abused its discretion in deciding whether to award sanctions (or not award them). Cooter & Gell v. Hartmarx Corp., --- U.S. ----, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990). The court did not err in finding that the plaintiffs' PACA claim was frivolous. That claim was a loser from the start, and the plaintiffs' attorneys should have known it. Their contention that the bank was a potato dealer was (and is) ludicrous. Rule 11 is a salutary mechanism for giving lawyers the incentive to make an objective determination about the validity of their claim. The question of whether the court erred in not awarding sanctions to Third National on the "common law" claim is much closer. Though it is a very close issue, we must conclude that the court did not abuse its discretion in choosing not to award sanctions on this issue. The plaintiffs' factual investigation was adequate, and their legal conclusion that those facts might give rise to a cause of action, while ultimately unsuccessful, was colorable.
 
 
 29
 The magistrate awarded fees against Keith D. Parr, of the law firm of Lord, Bissell & Brook, a law firm located in Chicago, and against both Michael Nolan and John O. Threadgill, both of whom operated out of Tennessee and who apparently acted as local counsel. The attorneys contend that the district court erred in failing to hold a hearing to determine the degree of involvement that local counsel had in writing the pleading, motion, or paper found to violate the rule. They imply that, if local counsel relied on material submitted by the outside counsel who was actually litigating the case, local counsel should not be held liable for Rule 11 sanctions. This contention is not consistent either with the language of Rule 11 or applicable Supreme Court precedent. Rule 11 provides that "[e]very pleading, motion, and other paper of a party ... shall be signed by at least one attorney of record in the attorney's individual name...." The signature of the attorney "constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper, that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted in existing law or a good faith argument for the extension, modification, or reversal of existing law...." Fed.R.Civ.P. 11. The text of the rule does not provide a safe harbor for lawyers who rely on the representations of outside counsel. The opposite holding would not be consistent with the Supreme Court's decision in Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). There, the Supreme Court held that Rule 11 sanctions are assessed against the attorney who signs a paper in violation of the rule, not against the attorney's law firm. As the Court explained, "the purpose of Rule 11 as a whole is to bring home to the individual signer his personal nondelegable responsibility." Id. 110 S.Ct. at 460 (emphasis added).
 
 
 30
 The lawyers who sign materials submitted to federal courts have the responsibility to determine that those materials comply with Rule 11. If Nolan and Threadgill, acting as local counsel, signed Val-Land Farms's complaint relying entirely on the representations of Mr. Parr, so much the worse for them.
 
 V
 
 31
 The plaintiffs in this case lost out by shipping potatoes to a potato dealer. They could have insisted on getting a certified check or a cashier's check or a letter of credit from Compton Produce, but they chose not to do so. The plaintiffs are sympathetic figures, but we see no legal support for their claim that responsibility should be shifted to a bank that just happened to be handy. The judgment in favor of the defendants and the decision concerning Rule 11 sanctions is AFFIRMED.
 
 
 
 [1]
 The plaintiffs subject Robert Wrather to repeated ad hominem attacks because of his involvement in another proceeding in which his actions had been questioned by the FDIC. The plaintiffs never explain the relevance of his legal problems
 
 
 [2]
 The plaintiffs have not attempted to set the transaction aside as a voidable preference under the bankruptcy code, either in this proceeding or in any other related proceeding, at least so far as we can tell from the record before us. The reason for this omission is not apparent
 
 
 [3]
 A Shepard's search reveals that no reported Tennessee cases have cited Payne Bros., a fact that undermines our confidence that Payne Bros. reflects the current state of the law in Tennessee. We express no view on this issue since, even if Payne Bros. were good law, it would not help the plaintiffs